# Matter of A-G-G-, Respondent

*Decided May 12, 2011*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1)  Pursuant to section 208(b)(2)(A)(vi) of the Immigration and Nationality Act, 8 U.S.C. § 1158(b)(2)(A)(vi) (2006), and 8 C.F.R. § 1208.15 (2011), the framework for making firm resettlement determinations focuses exclusively on the existence of an offer of permanent resettlement and allows for the consideration of direct and indirect evidence.

(2)  The Department of Homeland Security has the initial burden to make a prima facie showing of an offer of firm resettlement by presenting direct evidence of an alien's ability to stay in a country indefinitely; when direct evidence is unavailable, indirect evidence may be used if it has a sufficient level of clarity and force to establish that the alien is able to permanently reside in the country.

(3)  An asylum applicant can rebut evidence of a firm resettlement offer by showing by a preponderance of the evidence that such an offer has not been made or that the applicant's circumstances would render him or her ineligible for such an offer of permanent residence.

(4)  Evidence that permanent resident status is available to an alien under the law of the country of proposed resettlement may be sufficient to establish a prima facie showing of an offer of firm resettlement, and a determination of firm resettlement is not contingent on whether the alien applies for that status. *Matter of Soleimani*, 20 I&N Dec. 99 (BIA 1989), modified.

FOR RESPONDENT:  Marquette D. Evans, Esquire, Cincinnati, Ohio

FOR THE DEPARTMENT OF HOMELAND SECURITY:  Ryan Alger, Assistant Chief Counsel

BEFORE:  Board Panel:  COLE, PAULEY, and GREER, Board Members.

COLE, Board Member:

In a decision dated April 10, 2007, an Immigration Judge granted the respondent's application for asylum under section 208 of the Immigration and Nationality Act, 8 U.S.C. § 1158 (2006 & Supp. III 2009).[1]  The Department

---

[1]  The Immigration Judge did not render a decision on the respondent's applications for voluntary departure, withholding of removal under section 241(b)(3) of the Act,
(continued...)

of Homeland Security ("DHS") has appealed from that decision, arguing that the respondent is subject to the firm resettlement bar to asylum in section 208(b)(2)(A)(vi) of the Act. In this case, we will set forth the Board's framework for making firm resettlement findings and remand the record for further proceedings.

## I. FACTUAL AND PROCEDURAL HISTORY

The respondent is a native and citizen of Mauritania and member of the black Wolof ethnic group.[2] In 1990, he was arrested and beaten by Mauritanian soldiers who transported him to a military camp. He was detained at the camp for a month, during which time he was held with other detainees in close quarters, inadequately fed, beaten, and forced to work as a slave. He was thereafter forcibly deported to Senegal, where he remained for a period of more than 8 years.

While living in Senegal, the respondent married a Senegalese citizen, with whom he had two children, and he worked in a market selling clothing. The respondent was issued an identification number in the Senegalese Government's registry of foreigners and never experienced any problems with Senegalese authorities.

The respondent departed Senegal and arrived in the United States in September 1999. He filed an application for asylum with the former Immigration and Naturalization Service ("INS") less than a year later. The respondent was subsequently placed in these removal proceedings, where he renewed his application for asylum before the Immigration Judge.

During his individual hearing before the Immigration Judge, the respondent testified that he left Senegal because he did not have legal status there and he felt uncomfortable on account of Senegal's close proximity to Mauritania. He further testified that he never attempted to obtain permanent legal status in that country.

The Immigration Judge found the respondent credible and granted his application for asylum. Specifically, the Immigration Judge determined that the respondent suffered past persecution in Mauritania on account of his black Wolof ethnicity and that the DHS failed to rebut the regulatory presumption

---

(...continued)

8 U.S.C. § 1231(b)(3) (2006), or protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46. 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988), pursuant to 8 C.F.R. § 1208.16(c) (2007).

[2] The factual and procedural history set forth in this section is based on findings of facts and conclusions of law in the Immigration Judge's decision.

that the respondent has a well-founded fear of persecution in Mauritania on the same basis. In granting the respondent's application for asylum, the Immigration Judge rejected the DHS's argument that the respondent was firmly resettled in Senegal and was therefore barred from asylum pursuant to section 208(b)(2)(A)(vi) of the Act. Finally, the Immigration Judge determined that the respondent merited a grant of asylum in the exercise of discretion.

## II. ISSUE

The issue before us is whether the respondent is subject to the firm resettlement bar and is therefore ineligible for asylum. In deciding this issue, we will provide a framework for determining firm resettlement under section 208(b)(2)(A)(vi) of the Act and the corresponding regulations set forth at 8 C.F.R. § 1208.15 (2011).

## III. STANDARD OF REVIEW

We review de novo the question whether the facts support a determination that an alien was "firmly resettled" within the meaning of section 208(b)(2)(A)(vi) of the Act and 8 C.F.R. § 1208.15. 8 C.F.R. § 1003.1(d)(3)(ii) (2011). The Immigration Judge's findings of fact leading to the determination whether an alien was "firmly resettled" are reviewed for clear error. 8 C.F.R. § 1003.1(d)(3)(i).

## IV. ANALYSIS

### A. Current Statutory and Regulatory Language

Section 208(b)(2)(A)(vi) of the Act provides that an alien is ineligible for asylum if "the alien was firmly resettled in another country prior to arriving in the United States." The term "firm resettlement" is defined in the regulations set forth at 8 C.F.R. § 1208.15 as follows:

> An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he or she establishes:
>> (a) That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or
>> (b) That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the country

of refuge that he or she was not in fact resettled.  In making his or her determination, the asylum officer or immigration judge shall consider the conditions under which other residents of the country live; the type of housing, whether permanent or temporary, made available to the refugee; the types and extent of employment available to the refugee; and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

As the following history and analysis will show, firm resettlement has evolved from first being a mandatory bar to asylum, to being a discretionary factor for consideration, to finally reverting to the statutory mandatory bar that it is today.

## B.  History of the Firm Resettlement Bar

### 1.  Firm Resettlement as a Mandatory Bar Prior to 1957

The origins of the concept of firm resettlement as a bar to refugee protection were in the Constitution of the International Refugee Organization, http://treaties.un.org/doc/Treaties/1948/08/19480820%2007-01%20AM/Ch_V_1p.pdf ("IRO Constitution").  The International Refugee Organization was created to deal with the large-scale refugee and displaced persons crisis that existed in the aftermath of World War II.  The 1946 IRO Constitution defined refugees and displaced persons and excluded from protection those who had either acquired a new nationality or otherwise became "firmly established."[3]

The Displaced Persons Act of 1948 provided for the issuance of a visa to the United States to an "[e]ligible displaced person," who, among other requirements, "on January 1, 1948, had not been firmly resettled."  Displaced

---

[3]  The IRO Constitution provided that refugees or displaced persons "cease[d] to be the concern" of the IRO where one of the following occurred:

> (a) when they have returned to the countries of their nationality in United Nations territory, unless their former habitual residence to which they wish to return is outside their country of nationality; or (b) when they have acquired a new nationality; or (c) when they have, in the determination of the Organization *become otherwise firmly established*; or (d) when they have unreasonably refused to accept the proposals of the Organization for their resettlement or repatriation; or (e) when they are making no substantial effort towards earning their living when it is possible for them to do so, or when they are exploiting the assistance of the Organization.

IRO Constitution, annex I, part I, sec. D  (emphasis added).  The IRO Constitution does not define the meaning of the term "firmly established."

Persons Act of 1948, ch. 647, § 2(c)(1), 62 Stat. 1009, 1009. Similarly, the 1951 United Nations Convention Relating to the Status of Refugees, which remains in effect today, excludes from the definition of a "refugee" a person who "has acquired a new nationality, and enjoys the protection of the country of his new nationality" and a person who "is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country." United Nations Convention Relating to the Status of Refugees, art. 1, §§ C(3), E, *adopted* July 28, 1951, 189 U.N.T.S. 150 (entered into force Apr. 22, 1954), http://www.unhcr.org/protect/PROTECTION/3b66c2aa10.pdf.

Two years later, Congress passed the Refugee Relief Act of 1953, ch. 336, 67 Stat. 400. Under this Act, the term "refugee" was expressly limited to individuals who had not been "firmly resettled." *Id.* § 2(a), 67 Stat. at 400.[4]

## 2. Firm Resettlement from 1957 through Early 1990

In 1957, Congress amended the Immigration and Nationality Act of 1952 by granting a special nonquota immigrant visa to "refugee-escapees," but it omitted the "firmly resettled" language from the definition of a "refugee-escapee."[5] Act of Sept. 11, 1957, Pub. L. No. 85-316, 71 Stat. 639. In doing so, Congress eliminated firm resettlement as a statutory bar to establish refugee status. In addition, Congress did not include the firm resettlement bar in the Fair Share Refugee Act of 1960, Pub. L. No. 86-648, 74 Stat. 504, and the Act of October 3, 1965, Pub. L. No. 89-236, 79 Stat. 911.

However, in cases decided by the former INS, the Regional Commissioner continued to consider firm resettlement as a bar based on the reasoning that an alien who is firmly resettled can no longer be considered to be fleeing persecution. For example, in *Matter of Sun*, 12 I&N Dec. 36 (Reg. Comm'r

---

[4] The Refugee Relief Act of 1953 defined a "refugee" as

> any person in a country or area which is neither Communist nor Communist-dominated, who because of persecution, fear of persecution, natural calamity or military operations is out of his usual place of abode and unable to return thereto, *who has not been firmly resettled*, and who is in urgent need of assistance for the essentials of life or for transportation.

Refugee Relief Act of 1953 § 2(a), 67 Stat. at 400 (emphasis added).

[5] The 1957 amendment defined a "refugee-escapee" as "any alien who, because of persecution or fear of persecution on account of race, religion, or political opinion has fled or shall flee (A) from any Communist, Communist-dominated, or Communist-occupied areas, or (B) from any country within the general area of the Middle East, and who cannot return to such area, or to such country, on account of race, religion, or political opinion." Act of Sept. 11, 1957 § 15(c)(1), 71 Stat. at 643.

1966), an alien who was born in mainland China and fled to the Republic of China (Formosa), where he was given citizenship and issued a passport, sought refugee status in the United States pursuant to section 203(a)(7) of the Act, 8 U.S.C. § 1157 (1964). Although section 203(a)(7) of the Act did not contain an explicit firm resettlement bar, the Regional Commissioner concluded that the alien, who worked for the Government of Formosa for 16 years and enjoyed all of the rights of residence and employment offered to other citizens of that country, including citizenship and a passport, could not claim to be fleeing persecution.

The Regional Commissioner further reasoned that "Congress obviously did not intend that the fact that an individual had fled from a country because of persecution or fear of persecution should, regardless of intervening circumstances, qualify him forever as a refugee." *Matter of Sun*, 12 I&N Dec. at 39. Therefore, the Regional Commissioner determined that the alien was not a refugee under section 203(a)(7) of the Act because he was firmly resettled in Formosa. The Regional Commissioner further applied this reasoning to a series of 1967 cases involving citizens of China, holding that a firmly resettled alien is not fleeing persecution and is therefore not a refugee under section 203(a)(7) of the Act.[6] In all of these cases where firm resettlement was not a mandatory bar to refugee status, the Regional Commissioner considered whether the alien had the rights and privileges given to others residing permanently in the country.

In 1971, the Supreme Court addressed firm resettlement for the first time in *Rosenberg v. Yee Chien Woo*, 402 U.S. 49, 50 (1971), a case involving a native of China who lived and worked in Hong Kong for 6 years and entered the United States on a business visitor visa in 1960. The alien in that case sought admission as a refugee under section 203(a)(7) of the Act after he overstayed his visa and was placed in immigration proceedings. *Id.* at 50-51. The former INS found that the alien was firmly resettled in Hong Kong and concluded that his presence in the United States was not

---

[6] *Compare Matter of Moy*, 12 I&N Dec. 117, 120 (Reg. Comm'r 1967) (finding that an alien was firmly resettled where he lived for 2 years in Colombia, worked, and had substantial assets and a Colombian reentry permit with an expiration date), *and Matter of Ng*, 12 I&N Dec. 411 (Reg. Comm'r 1967) (finding that the alien was firmly resettled in Hong Kong, where he fled with his parents as a minor, because his parents' resettlement in Hong Kong was imputed to him), *with Matter of Chai*, 12 I&N Dec. 81 (Reg. Comm'r 1967) (finding that the alien was not firmly resettled in Hong Kong because he lived there as a student for 5 years and had not reestablished himself or been granted any rights or privileges offered to other citizens and permanent residents of Hong Kong), *and Matter of Hung*, 12 I&N Dec. 178 (Reg. Comm'r 1967) (finding that the alien was not firmly resettled in Hong Kong because, even though she had a British passport, she had only lived there as a minor with her family for 6 or 7 years and her parents and siblings were admitted into the United States and adjusted to lawful permanent resident status after her arrival in the United States).

a consequence of his flight. The United States District Court for the Southern District of California found that the alien was not firmly resettled, and the United States Court of Appeals for the Ninth Circuit upheld that decision. *Id.* at 51-52.

The Supreme Court found that although firm resettlement was not a statutory bar, it was relevant to an alien's refugee status under section 203(a)(7) of the Act. *Id.* at 56. The Court held that firm resettlement was "one of the factors which the [INS] must take into account to determine whether a refugee seeks asylum in this country as a consequence of his flight to avoid persecution." *Id.* The Court also observed that the 1957 amendment to the Act introduced a new requirement that the alien must have fled from certain areas in order to qualify as a refugee. *Id.* at 54-55. Therefore, the Court found that the omission of the "firmly resettled" language from the Refugee Relief Act of 1957 and subsequent refugee legislation was not an intentional act by Congress to depart from the established concept of firm resettlement. *Id.* Indeed, the Court found Congress' change in language consistent with the central theme of 23 years of refugee legislation, which was to create a "haven for the world's homeless people." *Id.* at 55. Drawing on this analysis, the Court concluded that Congress did not intend to provide refugee protection to aliens who had already found shelter and begun new lives in other countries. *Id.* at 56.

Following the Supreme Court's decision in *Yee Chien Woo*, the Regional Commissioner and the Board considered as an important discretionary factor in refugee determinations the question whether aliens had been granted the privileges and benefits given to others permanently residing in the country. In *Matter of Kwan*, 14 I&N Dec. 499 (Reg. Comm'r 1973), the Regional Commissioner found that an alien was firmly resettled in Hong Kong, where he had lived for more than 13 years, because he attained the status of a Chinese resident of Hong Kong, which granted him the privileges and benefits of permanent residence. Similarly, in *Matter of Guiragossian*, 17 I&N Dec. 161 (BIA 1979), the Board found that an alien from Bulgaria was firmly resettled in former West Germany because of his more than 12-year residence and steady employment in that country and his ability to return there after a visit to the United States.

In 1980, the INS issued interim regulations governing asylum procedures that made firm resettlement a mandatory bar to asylum in decisions by INS district directors. 8 C.F.R. § 208.8(f)(1)(ii) (1981). These regulations considered a refugee firmly resettled "if he was offered resident status, citizenship, or some other type of permanent resettlement by another nation and traveled to and entered that nation as a consequence of his flight from persecution." 8 C.F.R. § 208.14 (1981). The regulations provided an exception if the asylum applicant established "that the conditions of his residence in that nation were so substantially and consciously restricted by the

authority of the country of asylum/refuge that he was not in fact resettled." *Id*. Factors the district directors were to consider, "in light of the conditions under which other residents of the country live, [included] the type of housing, whether permanent or temporary, made available to the refugee, the types and extent of employment available to the refugee, and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges (such as travel documentation, education, public relief, or naturalization) available to others resident in the country." *Id*.

Although the mandatory firm resettlement bar was only applicable to the INS district directors, the Board treated firm resettlement as a bar and considered the INS regulatory factors in several cases. *See* 8 C.F.R. § 208.8(f)(1)(ii). For example, in *Matter of Lam*, 18 I&N Dec. 15, 19-20 (BIA 1981), the Board cited the 1980 regulations that provided for consideration of the housing, employment, property rights, and other rights and privileges available to refugees, as compared to those available to others resident in the country, and remanded the case for the Immigration Judge to consider the issue of firm resettlement. Likewise, in *Matter of Portales*, 18 I&N Dec. 239, 242 (BIA 1982), the Board found that Cuban asylum applicants had been firmly resettled in Peru where they were issued refugee documents valid for 2 years, there was no evidence in the record that the Peruvian Government would terminate previously granted refugee status or that the refugee documents were not renewable, and the aliens were permitted to live, travel, and be employed without restriction.

In *Matter of Soleimani*, 20 I&N Dec. 99, 103 (BIA 1989), the Board withdrew from *Matter of Lam* and *Matter of Portales* insofar as those cases suggested that an alien found to have been firmly resettled is ineligible for asylum. We clarified that the regulations prohibiting INS district directors from granting asylum to aliens who had firmly resettled in a third country did not apply to either Immigration Judges or the Board itself. *Matter of Soleimani*, 20 I&N Dec. at 104. Rather, we found that firm resettlement could be considered as a discretionary factor by Immigration Judges and the Board in deciding whether to grant asylum. *Id.* at 103-05. However, we observed that a finding of firm resettlement would ordinarily preclude a grant of asylum unless the alien could demonstrate compelling countervailing equities in his or her favor. *Id.* at 105.

The alien in *Matter of Soleimani* was a Jewish woman who fled Iran and subsequently lived in Israel for 10 months. *Id*. at 100-01. She attended school to study Hebrew but did not work or seek any financial benefits or permanent status. *Id*. at 101, 107. An advisory opinion by the United States Department of State's Bureau of Human Rights and Humanitarian Affairs in the record of proceedings provided that pursuant to Israel's Law of Return, the alien was entitled to reside permanently and enjoy the rights of citizenship in Israel. *Id*. at 102. The Immigration Judge determined that the respondent could have

become a resident of Israel under the Law of Return and her choice to not become a resident did not obviate the fact that she was firmly resettled there. *Id*. at 102, 106. Therefore, the Immigration Judge found her firmly resettled in Israel and denied her application for asylum. *Id*. at 102.

The Board disagreed and found that the alien was not firmly resettled in Israel. We held that the offer must be actual and specific and the mere reference to the Law of Return was insufficient to establish firm resettlement. We found that the record lacked evidence that the alien would be eligible for "permanent resettlement" under the law and that there was no evidence regarding the extent of any restrictions or conditions that were placed on offers of resettlement under that law. *Id*. at 106. We further observed that the INS bore the burden of submitting evidence regarding foreign laws upon which it sought to rely. Concluding that the Law of Return was insufficient to establish firm resettlement, we held that a totality of the circumstances should be considered in determining whether an alien was firmly resettled, including such factors as the amount of time between the alien's flight and the application for asylum, as well as his or her family ties, intent, and business or property connections. *Id.*

### 3. Firm Resettlement as a Mandatory Bar After *Matter of Soleimani*

In 1990, the Attorney General amended the firm resettlement regulations. The amended regulations, which became effective October 1, 1990, provided for the mandatory denial of asylum based on a finding of firm resettlement by all adjudicators, not just the INS district directors. 8 C.F.R. § 208.14(c)(2) (1991). The definition of firm resettlement contained in the 1990 regulations is substantially the same as the current firm resettlement regulations set forth at 8 C.F.R. § 1208.15. *See* 8 C.F.R. § 208.15 (1991).

In 1996, Congress adopted the regulatory firm resettlement bar when it amended section 208 of the Act in section 604(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-691 ("IIRIRA"). *See* section 208(b)(2)(A)(vi) of the Act. The implementing regulations, which were finalized in 2000, clarified that the firm resettlement bar applies to asylum applications filed before and after the passage of the IIRIRA. *See* 8 C.F.R. §§ 1208.13(c)(1), (2) (2001).[7]

---

[7] To implement the IIRIRA, the Department of Justice published notice of proposed rulemaking on January 3, 1997, with a 30-day comment period. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 444 (Jan. 3, 1997). On March 6, 1997, the

(continued...)

### C.  Firm Resettlement in the Federal Courts of Appeals

Since 1990, the Federal courts of appeals that have addressed firm resettlement have adopted two approaches, which are identified as the "direct offer" approach and the "totality of the circumstances" approach.  Both approaches provide for the consideration of direct and indirect evidence of an offer of permanent resident status, citizenship, or some other type of permanent resettlement, which we will refer to as "firm resettlement."

The "direct offer" approach, which has been adopted by the United States Courts of Appeals for the Third, Seventh, and Ninth Circuits, focuses on the existence of an offer vel non, made by a government, of some type of permanent residence that would allow the alien to remain in that country indefinitely in some official status.  *See Maharaj v. Gonzales*, 450 F.3d 961 (9th Cir. 2006); *Diallo v. Ashcroft*, 381 F.3d 687 (7th Cir. 2004); *Abdille v. Ashcroft*, 242 F.3d 477 (3d Cir. 2001).[8]  Under this approach, the courts look first to direct evidence of an offer, such as a grant of asylum, a residence permit, a resident stamp, or some type of travel document such as a passport.  If direct evidence is unobtainable, the courts look to indirect evidence of an offer, such as the country's citizenship or residence laws, the length of an alien's stay in a third country, the alien's intent to remain in the country, and the extent of the social and economic ties developed by the alien.  These courts have also observed that this indirect evidence may constitute an offer of firm resettlement if it rises to a "sufficient level of clarity and force" to indicate that the third country officially sanctions the alien's indefinite presence.  *Abdille v. Ashcroft*, 242 F.3d at 487; *see also Maharaj v. Gonzales*, 450 F.3d at 973-74; *Diallo v. Ashcroft*, 381 F.3d at 694.

By contrast, the totality of the circumstances approach adopted by the Second and Fourth Circuits considers evidence of a direct offer of firm resettlement as only one factor to be considered with other factors that are not

---

(...continued)
Department of Justice published an interim rule with request for comments, which became effective April 1, 1997.  Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312 (Mar. 6, 1997).  The final rule was issued on December 6, 2000, and became effective on January 5, 2001.  Asylum Procedures, 65 Fed. Reg. 76,121 (Dec. 6, 2000).

[8]  The Tenth Circuit also appears to follow the direct offer approach but has not explicitly adopted that approach in a published decision.  *See Elzour v. Ashcroft*, 378 F.3d 1143, 1151-52 (10th Cir. 2004); *Abdalla v. INS*, 43 F.3d 1397 (10th Cir. 1994).

offer based, which we refer to as "indirect evidence."[9]  *See Sall v. Gonzales*, 437 F.3d 229 (2d Cir. 2006); *Mussie v. U.S. INS*, 172 F.3d 329 (4th Cir. 1999). Other factors considered by the courts include the length of an alien's stay in the third country, familial ties, receipt of benefits, and business or property connections.  Under the totality of the circumstances approach, indirect evidence is still considered even if there is direct evidence of an offer of firm resettlement.  The remaining five circuits, the First, Fifth, Sixth, Eighth, and Eleventh Circuits, have not adopted an explicit approach on firm resettlement.

Despite these divergent approaches, there is consistency in the framework applied by the circuit courts.  The courts agree that the DHS bears the initial burden of going forward with evidence indicating that the firm resettlement bar applies.  *See, e.g.*, *Maharaj v. Gonzales*, 450 F.3d at 972-73; *Sall v. Gonzales*, 437 F.3d at 233-34; *Diallo v. Ashcroft*, 381 F.3d at 693; *Salazar v. Ashcroft*, 359 F.3d 45, 50 (1st Cir. 2004); *Abdille v. Ashcroft*, 242 F.3d at 480, 491-92; *Mussie v. U.S. INS*, 172 F.3d at 331-32; *Abdalla v. INS*, 43 F.3d 1397, 1399 n.8 (10th Cir. 1994).  Both approaches allow for evaluation of direct and indirect evidence of an offer of firm resettlement.  The courts also allow for the consideration of evidence submitted by the alien to rebut the DHS's evidence of firm resettlement.  *See, e.g.*, *Diallo v. Ashcroft*, 381 F.3d at 693; *Salazar v. Ashcroft*, 359 F.3d at 50.

### 1.  Direct Offer Approach

The circuit courts adhering to the direct offer approach first consider evidence of whether an offer of firm resettlement has been made.  For example, in *Abdille v. Ashcroft*, 242 F.3d at 480-81, 488, a case involving a Somalian individual who was granted asylum in South Africa, the DHS presented a Certificate of Exemption from the South African Government, which entitled the alien to asylum for a 2-year period.  *Id.* at 488.  The DHS also introduced a letter from the South African Government, which provided that at the end of his 2-year period he was required to contact the Department of Home Affairs to have his refugee status reviewed or to otherwise legalize his stay.  *Id.* at 488-89.  The letter indicated that if he did not do so and decided to remain in South Africa without legalizing his status, he would face prosecution under South African law.  *Id.*  The Board affirmed the Immigration Judge's firm resettlement finding. The Third Circuit reversed and remanded the case to the Board for further investigation into

---

[9] The District of Columbia Circuit also adopted the totality of the circumstances approach in *Chinese American Civic Counsel v. Attorney General of the United States*, 566 F.2d 321 (D.C. Cir. 1977).  However, that case was decided before firm resettlement was a mandatory bar and before the existence of the regulatory requirement focusing on a direct offer.

South African immigration law and practice and for a determination whether the alien's refugee status, which was valid for a 2-year period, amounted to a temporary offer or "some other type of permanent resettlement" within the meaning of 8 C.F.R. § 1208.15. *Id.* at 489-90.

In *Diallo v. Ashcroft*, 381 F.3d at 691, the Seventh Circuit considered the case of a native and citizen of Mauritania who lived in Senegal for 4 years but did not have a work permit or official permission to remain there. The Board affirmed the Immigration Judge's finding that the alien was firmly resettled in Senegal. The Seventh Circuit reversed the firm resettlement finding, in part because the Immigration Judge failed to consider whether a formal offer of resettlement had been made. The court also found that the Immigration Judge ignored the alien's testimony that he lacked a legal right to live or work in Senegal. The court concluded that the alien's 4-year stay, his work as a merchant without permission, and the fact that he shared an apartment with an acquaintance were insufficient to show that he was given an offer of firm resettlement in Senegal. *Id.* at 695-96.

Similarly, in *Maharaj v. Gonzales*, 450 F.3d at 973, the Ninth Circuit found that the existence of an offer was the exclusive means of establishing firm resettlement under a plain reading of the regulations. The court reversed the Board's decision, which found an alien from Fiji firmly resettled in Canada because he lived and worked there for 4 years, received government benefits, and applied for asylum but failed to await adjudication of his application. The court remanded the record for further consideration of the question whether a direct offer of firm resettlement had been made. *Id.* at 977-78. Specifically, the court remanded for the DHS to present evidence regarding the Canadian refugee process, including what restrictions apply and whether refugee status in Canada amounted to an offer of firm resettlement.[10]

---

[10] The Ninth Circuit recently recognized the importance of making explicit firm resettlement determinations in *Su Hwa She v. Holder*, 629 F.3d 958 (9th Cir. 2010). In that case, the court observed that the Immigration Judge did not enter a finding on firm resettlement. *Id.* at 963. The court found that the DHS met its initial burden of showing firm resettlement where a Burmese asylum applicant obtained a Taiwanese passport. *Id.* at 962, 964. However, the court noted that direct evidence of nationalization may not be sufficient to establish firm resettlement where the alien's credible testimony could refute the significance of nationalization. *Id.* at 963 n.3. The alien claimed that she fraudulently obtained her Taiwanese passport and that she only stayed in Taiwan as long as necessary to arrange further travel. *Id.* at 962-63. The court remanded the case to the Board to further clarify its firm resettlement finding. *Id.* at 963-64.

### 2.  Totality of the Circumstances Approach

The two circuits adopting the totality of the circumstances approach give equal weight to all factors and consider indirect evidence even if there is direct evidence of an offer of firm resettlement.  In *Mussie v. U.S. INS*, 172 F.3d 331-32, the Fourth Circuit upheld the Board's firm resettlement finding because the alien, an Ethiopian woman, was granted asylum by Germany and had German travel documents.  Although this would be direct evidence of an offer of firm resettlement, the court also considered other indirect evidence, including the alien's 6-year residence in Germany, employment, payment of taxes, rental of an apartment, and her receipt of government assistance for language schooling, transportation, rent, and food.

Similarly, in *Sall v. Gonzales*, 437 F.3d at 235, the Second Circuit found that evidence that a Mauritanian man was living in Senegal for 5 years was insufficient to establish firm resettlement and remanded the case for consideration of the totality of the circumstances.  The court emphasized that the question whether the alien received an "actual offer of permanent resident status" was of particular importance to the firm resettlement inquiry.  *Id.* at 235.  However, the court found that indirect evidence should also be considered.  Such indirect evidence included the following:  the alien's intention to settle in Senegal, family ties, business or property connections, and whether he had legal rights normally given to people who are permanently resettled, such as the right to work and enter and exit Senegal.  *Id.*

Although the Second Circuit observed that the regulations place "particular importance" on the presence of an actual offer of permanent residence status, the court also noted that the regulations permit an offer of firm resettlement to come in forms other than a direct offer, because they provide for an offer of "some other type of permanent resettlement."  *Id.* at 233.  The court recognized that offers in countries with less elaborate immigration regimes than the United States may not include written documentation.  *Id.* Furthermore, the court found the broader analysis used in the totality of the circumstances approach to be more consistent with the underlying purpose of asylum, namely the protection of refugees with nowhere to turn, than the more rigid direct offer approach, which requires the receipt of a formal offer of firm resettlement.  *Id.*[11]

---

[11] More recently, in *Jin Yi Liao v. Holder*, 558 F.3d 152 (2d Cir. 2009), the Second Circuit considered the case of a Chinese alien who had lived in the Dominican Republic before seeking asylum in the United States.  Both the Immigration Judge and the Board found that the alien was firmly resettled in the Dominican Republic because she had received a temporary resident visa from the Dominican Republic. *Id.* at 155-57.  The Second Circuit reversed the Board and held that the alien's resident visa was insufficient to establish firm

(continued...)

### 3. Undecided Circuits

The remaining circuits have not clearly decided which approach to follow. The Fifth and Eleventh Circuits have not addressed firm resettlement in a published decision.[12]  In *Bonilla v. Mukasey*, 539 F.3d 72 (1st Cir. 2008), the First Circuit applied the direct offer approach in the case of a native of Colombia who had a 5-year Venezuelan resident stamp in his Colombian passport.  The court remanded the case to the Board to determine whether renewal of the resident stamp was an administrative requirement as routine as renewing a passport.  Although the court viewed the Venezuelan resident stamp as a potential direct offer of firm resettlement, it did not rule out the application of the totality of the circumstances approach in other cases.  *Id.* at 81-82.[13]

Although not explicitly adopting the direct offer approach, the Eighth Circuit found the aliens firmly resettled in Israel in *Rife v. Ashcroft*, 374 F.3d 606 (8th Cir. 2004).  The case involved Azerbaijani Christians who resided in Israel for 3 years and were offered citizenship and permanent resettlement visas under Israel's Law of Return.  The court held that the existence of a formal offer of firm resettlement is the proper place to begin the firm resettlement analysis but, in some cases, a formal offer is not dispositive.  *Id.* at 611.[14]

---

(...continued)

resettlement because the visa was temporary and expired within a month of the alien's arrival in the Dominican Republic.  *Id.* at 157-58.  The court concluded that the significance of the visa must be evaluated along with indirect evidence of firm resettlement.  *Id.* at 158. The case was remanded to the Board for further consideration.

[12]  The Fifth Circuit, in *Tesfamichael v. Gonzales*, 411 F.3d 169, 177 (5th Cir. 2005), questioned the firm resettlement determination by the Board and the Immigration Judge because the evidence in the case indicated that the alien had no intention of remaining in the third country and only stayed there to arrange further travel.  However, the court did not provide a firm resettlement analysis because the case before it only involved a motion for stay of removal, which it granted.

[13]  In *Bonilla v. Mukasey*, 539 F.3d at 82 n.3, the court noted in dicta that a finding of firm resettlement can be supported by indirect evidence, such as the alien's establishment of significant familial or business ties or the prolonged duration of the alien's resettlement.

[14]  The Eighth Circuit did not enunciate the factors to be considered where the existence of a formal offer of firm resettlement is not present or dispositive.  However, the court cited its decision in *Farbakhsh v. INS*, 20 F.3d 877 (8th Cir. 1994), which was issued prior to the mandatory firm resettlement bar, as an example of a case in which a formal offer was not dispositive.  *Rife v. Ashcroft*, 374 F.3d at 611.  In *Farbakhsh v. INS*, 20 F.3d at 882, the Eighth Circuit applied the totality of the circumstances approach to find an Iranian citizen firmly resettled in Spain, because he had resided in that country for more than 4 years

(continued...)

In *Ali v. Reno*, 237 F.3d 591 (6th Cir. 2001), the Sixth Circuit, in whose jurisdiction this case arises, considered the situation of an Iraqi woman who resided in Denmark.  The court found that the alien received an offer of "permanent resident status" because she was granted refugee status by the Danish Government before her entry to that country and received a Danish passport and residence permit.  *Id.* at 595.  Therefore, the court held that she was firmly resettled in Denmark without explicitly adopting the direct offer or totality of the circumstances approach.[15]

### D.  Framework for Firm Resettlement Determinations

As at least one circuit court has observed, the Board has not issued a decision setting forth the proper framework to apply to firm resettlement determinations under current law since *Matter of Soleimani*, when firm resettlement was applied as a discretionary factor.  *See Maharaj v. Gonzales*, 450 F.3d at 971-72 ("Unfortunately, the BIA has not revisited firm resettlement in a published opinion since *Soleimani* was decided in 1989 under a different, discretionary regime.").[16]  We now

---

(...continued)
with the intention to remain, had a pending asylum application, and had two siblings residing there.

[15] The Sixth Circuit also noted that the declaration by Danish authorities that they were not obligated to accept the alien into their country did not undermine the Board's finding of firm resettlement because the firm resettlement regulations focus on the alien's status prior to entering the United States.  *Ali v. Reno*, 237 F.3d at 596.

[16] We have published two cases involving firm resettlement since *Matter of Soleimani*. However, neither case sets forth a framework for firm resettlement determinations. In *Matter of D-L- & A-M-*, 20 I&N Dec. 409, 414 (BIA 1991), we did not view firm resettlement as a mandatory bar but rather, pursuant to *Matter of Soleimani*, considered whether or not the Cuban asylum applicants merited asylum as a matter of discretion, despite their firm resettlement in a third country.  The asylum applicants were found to have firmly resettled in Spain because they lived and worked in that country for 6 years as lawful temporary residents with the option to become permanent residents.  We held that the applicants demonstrated no compelling countervailing equities to warrant a discretionary grant of asylum despite their firm resettlement in Spain.

More recently, in *Matter of K-R-Y- & K-C-S-*, 24 I&N Dec. 133 (BIA 2007), we addressed the firm resettlement bar as it relates to the North Korean Human Rights Act of 2004, Pub. L. No. 108-333, 118 Stat. 1287 ("NKHRA").  The NKHRA provides that North Koreans cannot be denied refugee status or asylum in the United States on account of their legal right to apply for and receive South Korean citizenship under the Constitution of South Korea.  NKHRA § 302(a), 118 Stat. at 1295.  The NKHRA also specifies that it does not apply to former North Korean nationals, such as the asylum applicants
(continued...)

set forth a framework for determinations involving firm resettlement as a mandatory bar to asylum.

Our framework for making firm resettlement determinations involves a four-step analysis, which follows the language of the regulations at 8 C.F.R. § 1208.15 and focuses exclusively on the existence of an offer. The framework is consistent with both the direct offer and totality of the circumstances approaches because, like these, it allows for the consideration of direct and indirect evidence. It is also consistent with 8 C.F.R. § 1003.1(d)(1), which requires the Board to follow the regulations in its adjudication of cases. Although the regulations do not explicitly identify factors to consider in determining whether an offer was made, we find that according equal weight to indirect evidence, such as the country's residence laws, length of an alien's residence in an intervening country, or the alien's intent, is inconsistent with the fact that only the government of the intervening country can grant an alien the right to lawfully and permanently reside there. Such a right "cannot be gained through adverse possession." *Abdille v. Ashcroft*, 242 F.3d at 487.

In the first step of the analysis, the DHS bears the burden of presenting prima facie evidence of an offer of firm resettlement. Neither section 208(b)(2)(A)(vi) of the Act nor the firm resettlement regulations at 8 C.F.R. § 1208.15 explicitly allocate the burden of proving firm resettlement. However, firm resettlement determinations are governed by the general regulation relating to relief from removal, which provides that once the "evidence indicates" that a mandatory bar to relief "may apply," the alien bears the burden of showing by a preponderance of the evidence that the mandatory bar does not apply. 8 C.F.R. § 1240.8(d) (2011).

As previously discussed, the circuit courts of appeals have held that the DHS bears the initial burden of establishing that "evidence indicates" that a mandatory bar to relief applies. Furthermore, in this case the DHS does not dispute that it bears the initial burden of making a prima facie showing that the respondent was firmly resettled in Senegal.

In order to make a prima facie showing that an offer of firm resettlement exists, the DHS should first secure and produce direct evidence of governmental documents indicating an alien's ability to stay in a country indefinitely. Such documents may include evidence

---

(...continued)

in *Matter of K-R-Y- & K-C-S-*, who have taken advantage of the opportunity to seek and accept South Korean citizenship. *Id.* We therefore held that the asylum applicants, who were granted citizenship in South Korea in the late 1990's, were firmly resettled in that country and were ineligible for asylum.

of refugee status, a passport, a travel document, or other evidence indicative of permanent residence.[17]

If direct evidence of an offer of firm resettlement is unavailable, indirect evidence may be used to show that an offer of firm resettlement has been made if it has a sufficient level of clarity and force to establish that an alien is able to permanently reside in the country. Indirect evidence may include the following: the immigration laws or refugee process of the country of proposed resettlement; the length of the alien's stay in a third country; the alien's intent to settle in the country; family ties and business or property connections; the extent of social and economic ties developed by the alien in the country; the receipt of government benefits or assistance, such as assistance for rent, food, and transportation; and whether the alien had legal rights normally given to people who have some official status, such as the right to work and enter and exit the country. *See Maharaj v. Gonzales*, 450 F.3d at 974; *Sall v. Gonzales*, 437 F.3d at 235; *Diallo v. Ashcroft*, 381 F.3d at 694; *Abdille v. Ashcroft*, 242 F.3d at 487; *Mussie v. U.S. INS*, 172 F.3d at 331-32.

The existence of a legal mechanism in the country by which an alien can obtain permanent residence *may* be sufficient to make a prima facie showing of an offer of firm resettlement. *See Elzour v. Ashcroft*, 378 F.3d 1143, 1152 (10th Cir. 2004) (observing that "a third country's offer of permanent resettlement may consist of providing a defined class of aliens a process through which they are entitled to claim permanent refuge").[18] Moreover, a determination of firm resettlement is not contingent on whether the alien applies for that status. *Id.* at 1152 ("If an alien who is entitled to permanent refuge in another country turns his or her back on that country's offer by failing to take advantage of its procedures for obtaining relief, he or she is not generally eligible for asylum in the United States").

Therefore, *Matter of Soleimani*, 20 I&N Dec. 99, would be decided differently if considered under the framework set forth today. The fact that the alien in that case did not apply for permanent resettlement in Israel through its Law of Return would not foreclose a firm resettlement determination, because the Law of Return would be considered as indirect evidence of an offer of firm resettlement. She would have been found firmly resettled unless she presented rebuttal evidence to show that she would not have been eligible for or granted

---

[17] Prima facie evidence of an offer of firm resettlement may already be a part of the record of proceedings as testimony or other documentary evidence.

[18] We note that in *Matter of D-L- & A-M-*, 20 I&N Dec. at 414, the Cuban asylum applicants who lived and worked in Spain as lawful temporary residents had the option to become permanent residents of Spain. Under the framework we establish today, the DHS would have met its burden of making a prima facie showing that an indirect offer of firm resettlement existed, because the asylum applicants had an opportunity, or "legal mechanism," to apply for permanent residence.

an offer of permanent resettlement or that one of the regulatory exceptions to firm resettlement applied.

Similarly, evidence that an offer of firm resettlement has been made may not be rebutted if the alien refused to accept an offer of firm resettlement or failed to renew permanent residence, which was possible, for example, through the renewal of a residence permit. *See Bonilla v. Mukasey*, 539 F.3d at 81 (observing that when an alien is entitled to maintain the resident status permanently as long as it is renewed, firm resettlement should bar the alien from receiving asylum if the renewal of a resident stamp is an administrative requirement as routine as renewing one's passport). The regulations only require that an offer of firm resettlement was available, not that the alien accepted the offer. *See* 8 C.F.R. § 1208.15. To hold otherwise would be contrary to the purpose of the firm resettlement bar, which is to limit refugee protection to those with nowhere else to turn.

The firm resettlement inquiry ends if the DHS fails to present prima facie evidence of an offer of firm resettlement or the record does not otherwise establish the existence of an offer of firm resettlement. *See* 8 C.F.R. § 1240.8(d). The Immigration Judge would then determine whether the alien has established eligibility for asylum and whether he or she merits relief as a matter of discretion.

In the second step of our firm resettlement framework, the alien can rebut the DHS's prima facie evidence of an offer of firm resettlement by showing by a preponderance of the evidence that such an offer has not, in fact, been made or that he or she would not qualify for it. The rebuttal may include evidence regarding how a law granting permanent residence to an alien is actually applied and why the alien would not be eligible to remain in the country in an official status.

In the third step, the Immigration Judge will consider the totality of the evidence presented by the parties to determine whether an alien has rebutted the DHS's evidence of an offer of firm resettlement. If the Immigration Judge finds that the alien has not rebutted the DHS's evidence, the Immigration Judge will find the alien firmly resettled.

In the final step, if the Immigration Judge finds the alien firmly resettled, the burden then shifts to the alien pursuant to 8 C.F.R. §§ 1208.15(a) and (b) to establish that an exception to firm resettlement applies by a preponderance of the evidence. If the alien establishes an exception, the alien can be granted asylum. If the alien fails to establish an exception, he or she will be subject to the mandatory bar for asylum.

### E. Application of the Firm Resettlement Framework

During proceedings before the Immigration Judge, the DHS offered evidence that the respondent was assigned an identification number in the

Senegalese Government's 1990 registry of foreigners.  The DHS also submitted two documents indicating that the respondent could obtain permanent status as the spouse of a Senegalese citizen.  The first document was a letter from the Library of Congress regarding "Requirements for Residency, Acquisition of Citizenship by Marriage or Naturalization" for Senegal.  The second was an Office of Personnel Management ("OPM") Investigations Service report entitled "Citizenship Laws of the World." According to this document, a foreigner who marries a Senegalese citizen is granted permanent residence and can apply for citizenship by naturalization. The respondent submitted a copy of Article 7 of the Nationality Code of Senegal, updated in December 1989, which addresses the acquisition of Senegalese nationality through marriage.  Article 7 only addresses the circumstances in which a foreign woman marries a Senegalese man.

The Immigration Judge determined that the respondent was not firmly resettled in Senegal because he found the evidence insufficient to establish that the respondent was offered firm resettlement.  He found that the respondent's receipt of an identification number in the registry of foreigners was insufficient to constitute an offer of firm resettlement.  Although the Library of Congress letter was admitted into the record, the Immigration Judge did not discuss the letter's statements regarding eligibility to acquire Senegalese citizenship regardless of gender.  The Immigration Judge observed that this letter provided that acquisition of citizenship by marriage is not automatic and that it is subject to official denial and requires a formal application, police record, and certificate of good character.  He rejected the DHS's argument that the respondent's marriage to a Senegalese citizen gave him immediate Senegalese citizenship. The Immigration Judge reasoned that the respondent did not apply for permanent residence in Senegal, and, even if he had, his application for permanent residence through marriage under Senegalese law could have been denied.

We disagree with the Immigration Judge's determination that the respondent was not firmly resettled because he did not apply for status in Senegal.  The failure to apply for permanent residence where it is available to an alien does not rebut evidence of firm resettlement.  *See Elzour v. Ashcroft*, 378 F.3d at 1152 (stating that if an alien fails to take advantage of procedures for obtaining permanent refuge in another country, he or she is not generally eligible for asylum).

We find that the DHS's direct evidence of the assignment of an identification number to the respondent is insufficient to show prima facie evidence of an offer of firm resettlement, because it does not indicate that the assignment of an identification number gives the respondent any legal rights normally given to citizens or other lawful residents.

However, we find that the indirect evidence presented by the DHS does rise to a sufficient level of clarity and force to establish a prima facie showing

of an offer of firm resettlement. The DHS presented two documents indicating that the respondent could obtain permanent residence as the spouse of a Senegalese citizen: (1) a Library of Congress letter, which indicates that a foreigner married to a Senegalese citizen can request Senegalese citizenship after the celebration of the marriage, and (2) an OPM document, which indicates that a foreigner who marries a Senegalese citizen is granted permanent residence and can apply for citizenship by naturalization. Based on these documents and the undisputed fact that the respondent is married to a Senegalese citizen, we find that the DHS has made a prima facie showing of an offer of firm resettlement.

To rebut the prima facie showing by the DHS, the respondent submitted Article 7 of the Nationality Code of Senegal. Article 7 explicitly provides that a foreign woman can acquire Senegalese citizenship through marriage to a Senegalese man, but it does not indicate that a foreign man can acquire citizenship by marrying a Senegalese woman. The DHS did not present any evidence that would indicate that this version of the Nationality Code of Senegal submitted by the respondent is outdated or not the law of Senegal. The Library of Congress letter, which was submitted by the DHS, acknowledges that the Nationality Code only pertains to a foreign woman marrying a Senegalese man. The letter also states that the information posted on an official website of the Senegalese Government "clearly addresses" both the marriage of a foreign woman to a Senegalese man and the marriage of a foreign man to a Senegalese woman. However, a copy and translation of the Senegalese Government website has not been provided by the DHS, and the respondent's attorney asserted that he could not find the website referenced in the Library of Congress letter.

Similarly, the OPM document regarding citizenship laws submitted by the DHS does not distinguish between the situations where a foreign man marries a Senegalese woman and a foreign woman marries a Senegalese man. Furthermore, the document does not indicate where the OPM obtained this information.

In light of the conflicting and incomplete evidence in the record, we find that a remand is necessary for the Immigration Judge to conduct further fact-finding consistent with the framework set forth above and for the parties to provide additional evidence, possibly including expert testimony.[19] Upon remand, the Immigration Judge should determine whether the respondent has rebutted the DHS's indirect evidence that shows that he could obtain permanent status as the spouse of a Senegalese citizen.

---

[19] We note that the content of foreign law is a question of fact. *See Matter of Annang*, 14 I&N Dec. 502, 503 (BIA 1973); *see also Abdille v. Ashcroft*, 242 F.3d at 490 n.10. We cannot make findings of fact on appeal. *See* 8 C.F.R. § 1003.1(d)(3)(i).

## V.  CONCLUSION

Based on the foregoing, we will remand the record to the Immigration Judge.  The focus on remand should be on whether Senegal applies its citizenship law on a gender-discriminatory basis such that only a foreign woman marrying a Senegalese man can acquire citizenship but not vice versa. The Immigration Judge should determine, based on the evidence in its totality, whether the respondent has rebutted the DHS's prima facie showing that he was offered firm resettlement in Senegal by a preponderance of the evidence and, if not, whether one of the regulatory exceptions applies.  *See* 8 C.F.R. §§ 1208.15, 1240.8(d).

**ORDER:**  The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion and for the entry of a new decision.