NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0193n.06

No. 23-3717

**FILED**
May 01, 2024
KELLY L. STEPHENS, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

MARYURY MEDELEY TARAZONA-QUINTERO, E.A.A.T.; NELSON YUNIOR ARAQUE-ROA,

   Petitioners,

v.

MERRICK B. GARLAND, Attorney General,

   Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES BOARD OF IMMIGRATION APPEALS

OPINION

Before: SUTTON, Chief Judge; WHITE and THAPAR, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Petitioners Maryury Tarazona-Quintero and Nelson Araque-Roa fled Venezuela to Mexico to escape threats from government-backed gangs. Then, after drug traffickers in Mexico repeatedly threatened them, they sought asylum in the United States with their son. The immigration judge (IJ) denied asylum on the basis that Petitioners had firmly resettled in Mexico, and the Board of Immigration Appeals (BIA) affirmed. Finding no basis to grant relief, we **DENY** Petitioners' petition for review.

**I.**

**A.**

Tarazona-Quintero and Araque-Roa are natives and citizens of Venezuela,[1] and both received threats from "colectivos"—armed gangs backed by President Nicolás Maduro's government—while in Venezuela. Araque-Roa was threatened twice in 2013 at the cattle

---

[1] Tarazona-Quintero also holds Colombian citizenship through her parents but has never lived in Colombia.

1

distribution facility where he worked. In the first incident, a group of thirty-five armed colectivos and national guard officers threatened the facility's workers and demanded cattle and the names of the facility's owners. In the second, a month later, a group of twenty-five officers and colectivos returned and made similar demands, this time holding Araque-Roa and his fellow workers at gunpoint in a locked room and threatening to torture and kill them. Araque-Roa next had a run-in with colectivos in January 2014, when he joined an anti-government protest and a colectivo struck him in the back and knocked him to the ground. Two months later, a group of men attacked and robbed Araque-Roa on his way home and threatened him for participating in protests. After that attack, colectivos began extorting his parents, threatening to kidnap or kill Araque-Roa and his siblings if they were not paid off. Araque-Roa started dating Tarazona-Quintero in December 2014, and the colectivos subsequently made similar threats against him to her parents. After his parents received a particularly serious threat, Araque-Roa decided that staying in Venezuela was untenable and left for Mexico in November 2016.

The threats against Tarazona-Quintero continued, however. After she too participated in anti-government protests in November and December 2016, colectivos came to her family's home in early 2017 and warned her to stop protesting. They also made threats against her to her parents over the phone and continued seeking information about Araque-Roa. In October 2017, she left Venezuela and joined Araque-Roa in Mexico.

The couple remained in Mexico for the next four years, and Tarazona-Quintero gave birth to the couple's son—a Mexican citizen—in October 2018. However, in 2021, after the family moved to the city of Santa Catarina, drug traffickers began threatening and harassing them. After Tarazona-Quintero's phone was stolen, the couple began receiving calls from people who identified themselves as drug traffickers, said they knew the couple was Venezuelan, and

threatened to kill the family if they did not sell drugs for the callers. The callers also threatened the couple's son, claiming they had learned the location of his daycare from Tarazona-Quintero's phone. During this time, the couple also noticed two cars sitting outside their home "for hours." AR 81. Araque-Roa reported the threats to a police officer on patrol, but the officer refused to investigate or intervene because Araque-Roa was Venezuelan and without "papers." *Id.* at 83. The family made no further attempts to report the threats to police. Instead, they moved to a nearby municipality, Garcia. But the threatening calls resumed after a few days. Believing they were unsafe in Mexico, the family left for the United States in August 2021.[2]

## B.

The Department of Homeland Security (DHS) initiated removal proceedings in September 2021, and Petitioners submitted applications for asylum and withholding of removal.[3] Both adult Petitioners stated in these applications that, before arriving in the United States, they had "received permanent legal residence in Mexico." *Id.* at 476, 817. They testified to the same effect at an April 25, 2022 hearing before the IJ. Araque-Roa testified that he received "an ID card and . . . permanent residence" in 2018. *Id.* at 85. He explained that he received this status as a refugee and due to the length of time he had lived in Mexico, and that this status did not grant him the right to vote. He testified that, alternatively, he could obtain permanent resident status through his citizen son. Tarazona-Quintero testified that she received an ID card and permanent resident status in 2019, and that her legal status derived from her son. Her status, she was told, did not need to

---

[2] Tarazona-Quintero and Araque-Roa married in Michigan in 2022.

[3] The couple's applications included a derivative claim for their son.

be renewed and "wouldn't expire." *Id.* at 147. Petitioners also described the threats and harassment they experienced in Venezuela and Mexico.

The IJ concluded that Petitioners suffered persecution in Venezuela based on their political opinion and had a well-founded fear of future persecution should they return, and granted their application for withholding of removal to Venezuela. However, the IJ denied asylum and ordered removal to Mexico on the basis that Petitioners had firmly resettled there. Petitioners appealed, arguing that asylum should have been granted. The BIA affirmed the IJ's finding of firm resettlement and dismissed Petitioners' appeal. They now seek review in this court.

## II.

### A.

"In considering a petition for review of a decision of the Board of Immigration Appeals, we review the Board's legal determinations de novo, and its factual findings under the substantial evidence standard." *Mostafa v. Ashcroft*, 395 F.3d 622, 624 (6th Cir. 2005) (internal citations omitted). "Where the Board adopts the IJ's decision and supplements that decision with its own comments, as in this case, we review both the BIA's and the IJ's opinions." *Hachem v. Holder*, 656 F.3d 430, 434 (6th Cir. 2011). A finding of firm resettlement is a factual finding subject to the substantial-evidence standard. *Hussam F. v. Sessions*, 897 F.3d 707, 719 (6th Cir. 2018) (per curiam); *Hanna v. Holder*, 740 F.3d 379, 386 (6th Cir. 2014). This standard "requires us to uphold the Board's findings as long as they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Mostafa*, 395 F.3d at 624 (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)); *see Klawitter v. INS*, 970 F.2d 149, 152 (6th Cir. 1992) ("[T]o reverse the BIA's factual determinations, the reviewing court must find that the evidence not only supports a contrary conclusion, but indeed *compels* it.").

**B.**

Noncitizens are eligible for asylum if they show they suffered past persecution or have a well-founded fear of future persecution because of their "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b)(1)(B)(i); *see* 8 C.F.R. § 1208.13(b) (2020). However, noncitizens are not eligible for asylum if they were "firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(vi). Receiving "an offer of permanent resident status, citizenship, or some other type of permanent resettlement" in another country establishes firm resettlement, unless a specified exception applies. 8 C.F.R. § 1208.15 (2020).

**C.**

The BIA has developed a four-step, burden-shifting framework to evaluate firm resettlement, which Petitioners argue it applied erroneously here. *See In re A-G-G-*, 25 I. & N. Dec. 486, 501 (BIA 2011). This court has not adopted that framework, but has evaluated the BIA's application of it where the parties do not argue—as they do not here—that it is inconsistent with the law. *See Damus v. Garland*, 2023 WL 34242, at *3 (6th Cir. Jan. 4, 2023); *Hanna*, 740 F.3d at 394. Under this framework, DHS initially "bears the burden of presenting prima facie evidence of an offer of firm resettlement." *Hanna*, 740 F.3d at 393–94 (quoting *In re A-G-G-*, 25 I. & N. Dec. at 501). If DHS makes this showing, the burden shifts to the respondent to rebut this evidence "by showing by a preponderance of the evidence that such an offer has not, in fact, been made or that he or she would not qualify for it." *Id.* at 394 (quoting *In re A-G-G-*, 25 I. & N. Dec. at 501). In the third step, the IJ considers "the totality of the evidence" to determine whether DHS's evidence has been rebutted; if it has not, the respondent must "establish that an exception to firm

5

resettlement applies by a preponderance of the evidence." *Id.* (quoting *In re A-G-G-*, 25 I. & N. Dec. at 501).

Petitioners argue that the BIA incorrectly found DHS met its prima facie burden by allowing DHS to rely on Petitioners' own statements, rather than requiring DHS to produce separate corroborating evidence establishing their permanent resident status in Mexico. Under the first step of the *A-G-G-* framework, DHS "should first secure and produce direct evidence of governmental documents indicating" permanent resident status. *In re A-G-G-*, 25 I. & N. Dec. at 501. Alternatively, this evidence "may already be a part of the record of proceedings as testimony or other documentary evidence." *Id.* at 502 n.17. Indirect evidence may also be used if direct evidence is unavailable. *Id.* at 502. In Petitioners' case, the IJ noted that DHS itself did not submit any documents establishing their permanent resident status in Mexico. However, it concluded that Petitioners' testimony, combined with indirect evidence—"the length of their stay in Mexico, their ability to work and obtain housing there, and their apparent intent to remain there indefinitely" prior to the traffickers' threats—sufficed. AR 179.

Petitioners argue that the requirement that DHS "first secure and produce direct evidence" means DHS should not have been able to rely on Petitioners' hearing testimony, evidence *Petitioners* introduced. They further argue that because direct evidence was available, the IJ should not have relied on indirect evidence. Finally, they argue that *A-G-G-* should be read to allow DHS to rely on evidence already in the record only if that evidence was submitted prior to the final merits hearing.

Our decision in *Hanna v. Holder* forecloses these arguments. In *Hanna*, we held that an immigration respondent's testimony can constitute prima facie evidence of firm resettlement. 740 F.3d at 394. And because Petitioners' testimony alone was sufficient to satisfy the first step of the

*A-G-G-* framework, the IJ did not err by bolstering this conclusion with indirect evidence. Finally, *Hanna* does not limit DHS to relying on a respondent's statements before the final hearing. *Id.* (DHS can meet its prima facie burden by citing "testimony at the hearing" (quoting *Firmansjah v. Gonzales*, 424 F.3d 598, 602 (7th Cir. 2005))). But even if DHS were so limited, it did rely in part on evidence submitted before the hearing—the statements in Petitioners' asylum applications, which were prepared by counsel, certified truthful under penalty of perjury, and uncontradicted by any other evidence in the record.

Petitioners argue that allowing DHS to rely on their testimony places immigration respondents, who are typically laypeople and may not understand the complexities of various countries' immigration laws, in an unfair position. Although Petitioners are likely correct that, in general, immigration respondents may not always accurately understand their legal status, there is no evidence that was the case here. Petitioners point to no evidence indicating they suffered any such confusion, and their counsel conceded during the hearing that he could cite nothing in record undermining their testimony. Further, this type of evidence would have been proper at the second step of the *A-G-G-* framework.

We find no basis to conclude that the BIA erroneously found Petitioners firmly resettled in Mexico.

**D.**

Next, Petitioners argue that the BIA erred in dismissing their appeal because their testimony about the threats they faced in Mexico established an exception to the firm resettlement

bar.[4] A noncitizen who has received permanent resident status in another country is not considered firmly resettled if "the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of [that] country . . . that he or she was not in fact resettled." 8 C.F.R. § 1208.15(b) (2020).[5] The IJ found, and the BIA affirmed, that the traffickers' threats and Araque-Roa's single discriminatory interaction with the patrol officer did not demonstrate that the Mexican government "substantially and consciously restricted" Petitioners' residence there. *Id.* The IJ noted that Petitioners identified no other discriminatory incidents nor any evidence demonstrating that the Mexican government restricted their basic rights. It also concluded that although the Mexican government has poorly contained violent crime, the record did not demonstrate that "the government actively supports or condones such violence." AR 181. The BIA likewise found that Petitioners had not established either that the Mexican government was directly responsible for any restrictions on their residence or that it actively supported the private actors threatening them.

We conclude, given the deferential nature of our review, that the BIA's and IJ's findings were supported by substantial evidence. *See Mostafa*, 395 F.3d at 624. Petitioners have not established that an exception to the firm resettlement bar applies.

---

[4] Before the IJ and the BIA, Petitioners attempted to invoke a "continuing fear" exception to firm resettlement but cited no authority recognizing such an exception. The IJ and BIA therefore treated this as an argument that the "restrictive conditions" exception applies.

[5] In determining whether this exception applies, the IJ must consider:

> [T]he conditions under which other residents of the country live; the type of housing, whether permanent or temporary, made available to the refugee; the types and extent of employment available to the refugee; and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

*Id.*

## III.

For the reasons set forth above, we **DENY** the petition for review.