**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**December 30, 2019**

**FOR THE TENTH CIRCUIT**
_____

**Elisabeth A. Shumaker**
**Clerk of Court**

ADAMA HEUREUX MATUMONA, a/k/a
Nikuna Adao,

     Petitioner,

v.

                         No. 18-9579

WILLIAM P. BARR, United States
Attorney General,

     Respondent.

NEW MEXICO IMMIGRANT LAW
CENTER; SANTA FE DREAMERS
PROJECT; AMERICAN IMMIGRATION
LAWYERS ASSOCIATION; STEVEN R.
ABRAMS; JEFFREY S. CHASE;
TEOFILO CHAPA; GEORGE CHEW;
BRUCE J. EINHORN; CECELIA M.
ESPENOZA; NOEL FERRIS; JOHN F.
GOSSART, JR.; MIRIAM HAYWARD;
REBECCA JAMIL; CAROL KING;
ELIZA KLEIN; ELIZABETH A. LAMB;
MARGARET MCMANUS; CHARLES
PAZAR; GEORGE PROCTOR; LAURA
RAMIREZ; JOHN W. RICHARDSON;
LORY D. ROSENBERG; SUSAN ROY;
PAUL W. SCHMIDT; WILLIAM VAN
WYKE; GUSTAVO D. VILLAGELIU;
POLLY WEBBER, Retired Immigration
Judges and Former Members of the Board
of Immigration Appeals,

     Amici Curiae.
_____

**Petition for Review from the Board of Immigration Appeals**
_____

Tassity Johnson (Matthew E. Price, Jenner & Block LLP, Washington, D.C., and Keren Zwick andTania Linares Garcia, National Immigrant Justice Center, Chicago, IL, with her on the briefs), Jenner & Block LLP, Washington, D.C., for Petitioner.

Remi Da Rocha-Afodu, Trial Attorney (Joseph H. Hunt, Assistant Attorney General, Civil Division, and Mary Jane Candaux, Assistant Director, Office of Immigration Litigation, with her on the brief), U.S. Department of Justice, Washington, D.C., for Respondent

Nicole C. Henning, Jones Day, Chicago, Illinois, filed an Amici Curiae brief for the New Mexico Immigrant Law Center, Santa Fe Dreamers Project, and American Immigration Lawyers Association, in support of Petitioner.

Jean-Claude André and Katelyn N. Rowe, Sidley Austin LLP, Los Angeles, California, filed an amici curiae brief for Retired Immigration Judges and Former Members of the Board of Immigration Appeals, in support of Petitioner.
_____

Before **LUCERO**, **HARTZ**, and **MATHESON**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Petitioner Adama Matumona is a native and citizen of the Democratic Republic of the Congo (DRC). He petitions for review of the decision of the Board of Immigration Appeals (BIA) denying his application for asylum and withholding of removal. Regarding asylum, Petitioner argues that the BIA (1) erred in determining that he had firmly resettled in Angola, which barred him from applying for asylum, and (2) engaged in improper factfinding in determining he was ineligible for an exception to the firm-resettlement bar. On withholding of removal, he argues that the BIA improperly rejected his claims of past persecution and a well-founded fear of future persecution. Petitioner

2

also contests the BIA's determination that his due-process rights and his statutory right to a fair hearing were not violated by the failure of the immigration judge (IJ) to adequately develop the record and to implement appropriate safeguards for a pro se litigant detained in a remote facility.

Exercising jurisdiction under 8 U.S.C. § 1252(a), we affirm on all issues except that we remand to the BIA to consider Petitioner's claim that he is entitled to withholding of removal because of the alleged pattern or practice of the DRC government of persecuting persons with Petitioner's political views.

## I.      BACKGROUND

### A.      Factual Background

Petitioner presented himself to immigration officials at the United States border on January 4, 2017.  He was detained and placed in removal proceedings as a noncitizen seeking admission without valid entry documents.  *See* 8 U.S.C. § 1182(a)(7)(A)(i)(I). During the proceedings he was detained at the Cibola County Correctional Facility in Milan, New Mexico.[1]

At Petitioner's first master-calendar hearing in immigration court, he informed the IJ he was seeking asylum because he feared returning to the DRC.  The IJ gave him a list of legal-aid attorneys and an asylum application.  He expressed concern about being able to complete the application in English, which he does not understand.  The IJ explained that although she could not complete the form for him, "we'll probably have to find

---

[1]  The government notified this court on October 1, 2019, that Petitioner was removed to the DRC by the Department of Homeland Security (DHS) on September 24, 2019.

3

someone to help you." Certified Administrative Record (CAR) 441. Petitioner, who does understand French, ultimately completed his asylum application with the help of a French-speaking volunteer at Cibola. His asylum application alleged the following facts:[2] Petitioner was born in Kinshasa, DRC, and was a leader for five years in a political movement that opposed the then-government of the country. He took part in a January 2015 opposition march where state security officials attacked participants and killed at least five while the participants fled. After this incident he "was told that [he] needed to escape," so he fled to Angola with his common-law wife and changed his name. CAR 550. He feared the government would kill him if he returned to the DRC because of his political activism.

At the merits hearing the IJ offered Petitioner a continuance but he declined, saying that he wanted to proceed because he was currently "cut off from [his] family" and was dealing with unspecified medical issues. CAR 461–62. His asylum application was entered as an exhibit at the hearing, and the government submitted the 2016 Department of State Human Rights Report for the DRC. Petitioner testified that he had been a community organizer for Union pour la Démocratie et le Progrès Social (UDPS), a political party that opposed then-President Kabila's regime. His UDPS activities included organizing youth and others in his neighborhood to march in protest. In 2013

---

[2] The IJ and the BIA considered Petitioner's application as seeking three forms of relief: asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Although the application did not expressly state that he was seeking withholding of removal, a request for asylum is also deemed a request for withholding. *See* 8 C.F.R. § 1208.3(b). And Petitioner applied for relief under the CAT by checking a box on the first page of the Form I-589.

4

and 2014 he helped organize marches in response to the government's "Operation Likofi," which targeted opposition leaders and led to the kidnapping and killing of over 400 people. He went into hiding after the 2013 march, but he was able to move about in the open, albeit cautiously, after the march in 2014. A January 2015 march protested a proposed constitutional change to allow President Kabila to serve a third term. President Kabila responded by sending his men to the streets to injure and kill march participants. The government then began looking for the protest leaders, including Petitioner. Although he had not been physically harmed in the DRC, the killings of some organizers and the ongoing search for others caused him to fear for his safety. He fled to Angola in February 2015.

Petitioner initially fled to Angola alone, but he was later able to bring over his eight children and wife. His wife had their ninth child in Angola. He said that he was still fearful for his safety in Angola because the Angolan government is an ally of the Congolese government, and thus he could still be discovered and harmed there. He also testified, however, that he experienced no actual problems in Angola. To get documents to leave Angola, Petitioner found an Angolan family to "adopt" him so he could take their Angolan name and get an Angolan passport. CAR 467. When asked by the DHS attorney, "So you also have citizenship in Angola, correct," he responded: "Yes. I did went—I did go to through the process of trying to get a document to become an Angolan, but it is just a way of me getting the right documents so that I can move from Angola to Congo—to Brazil, but my real identity, I am a Congolese." *Id*. at 475. And when later asked by the IJ, "[W]hen you became a citizen of Angola, did you have to renounce your

5

citizenship in the Democratic Republic of Congo," he responded similarly, saying: "It is a need. It was a need-base kind of situation. I was never intended to become an Angolan. It was just a way for me to get the papers that I needed to get here but I maintain that, I still have my Congolese nationality and I think myself as a Congolese." *Id*. at 481. After staying in Angola for a little over a year, he left for Brazil without his family in March 2016. He chose Brazil because he believed it was easiest to obtain a Brazilian visa. He stayed in Brazil until he traveled to the United States to seek asylum.

### B. Procedural History

The IJ denied Petitioner's request for asylum on the ground of statutory ineligibility because he had firmly resettled in Angola. *See* 8 U.S.C. § 1158(b)(2)(A)(vi). The IJ denied his request for withholding of removal on the merits, ruling that he had not established past persecution or a clear probability of future persecution. Petitioner's request for protection under the CAT was also denied.

Petitioner obtained pro bono counsel and appealed the IJ's decision to the BIA. He also filed a motion asking the BIA to remand his case to the IJ to consider new allegedly material evidence, including additional country-conditions evidence and an affidavit of his own. The BIA dismissed the appeal. It affirmed the IJ's ruling that Petitioner had firmly resettled in Angola and decided that he did not qualify for any exception to the firm-resettlement bar to asylum. It also affirmed the IJ's decision that

6

Petitioner was not eligible for relief under withholding of removal or the CAT. And it rejected Petitioner's due-process arguments and denied his motion to remand.[3]

When Petitioner filed his first petition for review with this court, the government moved to remand to the BIA for consideration of his testimony that he fled the DRC because government officials were looking specifically for him. We granted the motion with instructions that the BIA could consider any matter Petitioner had properly preserved.

On remand the BIA dismissed Petitioner's appeal on the same grounds as before. The BIA stated that it had previously acknowledged the testimony that officials were looking for Petitioner and that even accepting the testimony as true, Petitioner could not establish that he faced an individualized risk of harm.

## II.    DISCUSSION

Petitioner appeals the BIA's denial of both asylum and withholding of removal.[4] He also makes several procedural challenges to the administrative proceedings, some of which are discussed below as part of his substantive claims and some of which are addressed afterwards.

### A.    Standard of Review

---

[3] In support of the motion to remand, Petitioner submitted his affidavit and other materials. But the BIA ruled that the affidavit was improper because he had not shown that its contents were previously unavailable. Petitioner has not challenged that ruling in this court.

[4] The BIA affirmed the IJ's decision that Petitioner did not meet his burden with regard to relief under the CAT, but he has not sought review of that decision in this court.

7

"We consider any legal questions de novo, and we review the agency's findings of fact under the substantial evidence standard." *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004). Under the substantial-evidence standard, we examine whether the "factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole." *Id.* at 1150. We have characterized the issue of whether an alien has established persecution as a question of fact. *See Vicente-Elias v. Mukasey*, 532 F.3d 1086, 1091 (10th Cir. 2008).[5] Also, we must "decide the petition [for review] only on the administrative record on which the order of removal is based." 8 U.S.C. § 1252(b)(4)(A). "[O]ur review is confined to the reasoning given by the IJ [and BIA], and we will not independently search the record for alternative bases to affirm." *Elzour*, 378 F.3d at 1150 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943)).

### B.    Asylum

Only refugees are eligible for asylum. To be considered a refugee, an applicant "must demonstrate either past 'persecution or a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Woldemeskel v. INS*, 257 F.3d 1185, 1188 (10th Cir. 2001) (quoting 8 U.S.C. § 1101(a)(42)(A)) (brackets in the original). A refugee is not eligible, however, if

---

[5] In *Xue v. Lynch*, 846 F.3d 1099, 1104–05 (10th Cir. 2017), *cert. dismissed*, 138 S. Ct. 420 (2017), we recognized the conflict between our characterization of the BIA's decision of whether persecution has been shown as a question of fact and the BIA's own characterization of an IJ's identical determination as a question of law reviewed de novo. Although the circuits are split on the standard of review applicable to the issue, the Supreme Court has yet to resolve it. *See Xue*, 846 F.3d at 1105, n.11 (collecting cases). Until it does, we are bound by our decision in *Vicente-Elias*.

he "was firmly resettled in another country prior to arriving in the United States." *Elzour*, 378 F.3d at 1149; *see* 8 U.S.C. § 1158(b)(2)(A)(vi). An applicant "is considered to be firmly resettled in a third country when 'prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement.'" *Elzour*, 378 F.3d at 1149 (quoting 8 C.F.R. § 208.15).

An applicant for relief from removal has the burden of establishing eligibility for asylum. *See* 8 C.F.R. § 1240.8(d). "If the evidence *indicates* that one or more of the grounds for mandatory denial of the application for relief *may apply*, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply." *Id*. (emphasis added). Thus, if the government presents evidence indicating that the applicant may have firmly resettled in a third country, the applicant bears the burden of proving by a preponderance of the evidence that he had not firmly resettled. *See Matter of A-G-G-*, 25 I. & N. Dec. 486, 501 (BIA 2011).

In *Matter of A-G-G-* the BIA set out its framework to determine whether an applicant was firmly resettled. First, to satisfy the requirement of showing that the firm-resettlement bar may apply, the government "bears the burden of presenting prima facie evidence of an offer of firm resettlement." *Id.* at 501. To make a prima facie showing, the government "should first secure and produce direct evidence of governmental documents indicating an alien's ability to stay in a country indefinitely." *Id.* "Such documents may include evidence of refugee status, *a passport*, a travel document, or other evidence indicative of permanent residence." *Id.* at 501–02 (emphasis added). If

9

such direct evidence is unavailable, the government may rely on indirect evidence, such as "the immigration laws or refugee process of the country of proposed resettlement; the length of the alien's stay in a third country; . . . family ties and business or property; . . . and whether the alien had legal rights normally given to people who have some official status, such as the right to work and enter and exit the country." *Id*. at 502. Note again, this prima facie case is not to establish firm resettlement by the preponderance of the evidence but need only *indicate* that the applicant *may have* firmly resettled.

The applicant can rebut the prima facie evidence by "showing by a preponderance of the evidence that . . . an offer [of firm resettlement] has not, in fact, been made or that he or she would not qualify for it"—for example, by presenting evidence "regarding how a law granting permanent residence to an alien is actually applied and why the alien would not be eligible to remain in the country in an official status." *Id.* at 503. If the BIA determines that the applicant firmly resettled, the applicant bears the burden to show by a preponderance of the evidence that he qualifies for an exception to firm resettlement under 8 C.F.R. §§ 1208.15(a) or (b). *See id.*

The BIA concluded that the government's prima facie burden was satisfied by Petitioner's Angolan passport. *See id.* at 501–02. Petitioner argues, however, that because he retained his Congolese citizenship and the Angolan passport was obtained fraudulently (he used the false name of his "adoptive" Angolan family to acquire it) it did not suffice. We disagree.

In *Matter of D-X- & Y-Z-*, 25 I. & N. Dec. 664, 665 (BIA 2012), the BIA held that the applicant's "Permit to Reside in Belize" was prima facie evidence of an offer of firm

10

resettlement.  The applicant then "sought to rebut the presumption of an offer of firm resettlement by asserting that the permits were obtained by fraud."  *Id*. at 665–66.  The BIA was not persuaded.  It said:  "As noted by the Immigration Judge, the permits are facially valid.  Even if the [applicants] used some form of fraud or bribery through a middleman to obtain them, there has been no showing that they were not issued by the Belize Government.  Furthermore, the female respondent used her permits to reenter Belize after visiting the United States."  *Id*. at 666.  The BIA then noted that three different circuit courts had rejected claims that firmly-resettled status should be disregarded if it had been acquired through fraud.  *See id*. (citing *Su Hwa She v. Holder*, 629 F.3d 958, 962–64 (9th Cir. 2010); *Firmansjah v. Gonzales*, 424 F.3d 598 (7th Cir. 2005); *Salazar v. Ashcroft*, 359 F.3d 45, 51 (1st Cir. 2004)).  The BIA concluded: "Accordingly, for these reasons, we hold that the [applicants'] claim of fraud in obtaining permits to reside in Belize does not rebut the [government's] prima facie evidence of firm resettlement in that country."  *Id*. at 666–67.

Petitioner does not challenge the decision in *Matter of D-X- & Y-Z-* but asks us to read it to hold that unless a fraudulently obtained document had been used for exit and reentry of the country that issued it, and enabled the holder to remain indefinitely, the fact that the document was fraudulent rebuts the prima facie case.  But that overreads both *Matter of D-X- & Y-Z-*and *Matter of A-G-G-*, which characterize the government's burden as only having to prove the applicant's ability to *stay* in the country, without mention of reentry.  *See Matter of D-X- & Y-Z-*, 25 I. & N. Dec. at 665 (requiring evidence "indicating an alien's ability to stay in a country indefinitely"); *Matter of A-G-*

11

*G-*, 25 I. & N. Dec. at 501–02 (same).  Petitioner's error is to focus on one fact in *Matter of D-X- & Y-Z-* and ignore the general thrust of the opinion.  In summarizing the three circuit opinions supporting its decision, it made no mention that in those cases the applicants had been able to reenter the country of issuance.  Rather, the thrust of the BIA opinion is simply that an applicant cannot rebut a firmly-resettled prima facie case by simply showing that the firm resettlement was obtained through fraud.  More is required.  For example, we assume that an applicant could rebut the prima facie case by showing that the fraud could be readily detected (as when the documents are not facially valid).  *See id*. at 665–66 (indicating methods of rebutting a prima facie case, such as by showing that the document was not actually issued by the government).

In this case, we hold that there was sufficient evidence to support the BIA's determination that the government had presented a prima facie case and Petitioner had not rebutted that case by a preponderance of the evidence.  Petitioner's Angolan passport allowed him to leave Angola, travel to and enter Brazil, and obtain and renew his Brazilian visa, certainly indicating its facial validity.  He advances no evidence that the passport was not issued by the Angolan government, that it had ever been treated as invalid, or that he would be denied reentry or be unable to remain in Angola with it.  On the contrary, at his merits hearing he did not contest the statements by the DHS attorney and the IJ that he had become a citizen of Angola; he responded only that his actions were so that he could ultimately get to this country and he still considered himself Congolese.

Despite Petitioner's contention that the false name on his passport makes the document an invalid offer of resettlement, he has failed to show that he would not be allowed to live in Angola under his "adopted" name, as he managed to for over a year before leaving. The false name does not undermine the passport's facial validity in a manner recognized by *Matter of A-G-G-* or *Matter of D-X- & Y-Z-*, nor does Petitioner offer any authority suggesting that use of a false name is distinguishable from other ways of "fraudulently obtain[ing]" a passport. (Indeed, as noted in the previous paragraph, he acknowledged that the passport conferred Angolan citizenship on him.) We therefore affirm the BIA's decision that Petitioner did not rebut the government's prima facie evidence of an offer of firm resettlement.

Petitioner next contends that he has shown by a preponderance of the evidence that an exception to the firm-resettlement bar applies. *See Matter of A-G-G-*, 25 I. & N. Dec. at 503. A person is not considered firmly resettled if he establishes:

(a) That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, *and that he or she did not establish significant ties in that country*; or

(b) That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled.

8 C.F.R § 1208.15 (emphasis added). Only the first exception is at issue here.

The BIA ruled that Petitioner established significant ties to Angola because he lived there over a year, obtained citizenship through his "adoptive" Angolan family, and brought his wife and children to the country. It stated that "although [Petitioner] testified

13

that he obtained the Angolan passport in order to travel to Brazil, he did not testify that he only stayed in Angola as long as it took to arrange onward travel." CAR 4. Because a finding of significant ties precludes him from meeting the first exception, the BIA determined that he did not rebut the government's showing that he was firmly resettled in Angola.

Petitioner raises two additional arguments against the BIA's resolution of the firm-resettlement issue. First, he argues that the BIA improperly engaged in its own factfinding in determining that he did not establish the exception. Under the BIA's regulations and precedents, the BIA should not make independent factual findings. *See* 8 C.F.R. § 1003.1(d)(3)(iv) ("[T]he Board will not engage in factfinding in the course of deciding appeals."); *In re S-H-*, 23 I. & N. Dec. 462, 465 (BIA 2002) ("If incomplete findings of fact are entered and the Immigration Judge's decision ultimately cannot be affirmed on the basis that he or she decided the case, a remand of the case for further fact-finding may be unavoidable."). But just because the IJ herself did not make the ultimate finding on the firm-resettlement exception does not mean the BIA necessarily engaged in impermissible factfinding. The BIA relied solely on facts found by the IJ to conclude that Petitioner established significant ties to Angola. Petitioner does not identify any fact relied on by the BIA that was not found by the IJ. *See Ullah v. U.S. Att'y Gen.*, 760 F. App'x 922, 930 (11th Cir. 2019) (BIA did not engage in impermissible factfinding to address argument not considered by IJ because "the BIA did not reject any of the IJ's fact findings, did not find any facts in the first instance, and did not reference any evidence upon which the IJ did not also rely in making the [same] ultimate

14

determination"). The BIA did not exceed its appellate authority in determining that Petitioner had been firmly resettled.

Petitioner next argues that the IJ denied him constitutional and statutory due process by not adequately developing the record on firm resettlement. The government does not dispute that an IJ has an affirmative duty to develop the record when the applicant is not represented. Although this court has not explicitly recognized this "affirmative" duty in a precedential decision, other circuits have. *See Yang v. McElroy*, 277 F.3d 158, 162 (2d Cir. 2002) ("[T]he IJ . . . unlike an Article III judge, is not merely the fact finder and adjudicator but also has an obligation to establish the record." (citing 8 U.S.C. § 1229a(b)(1))); *Abdurakhmanov v. Holder*, 735 F.3d 341, 346 n.4 (6th Cir. 2012) ("An IJ has not only an ability, but an obligation, to ask questions of the alien during the hearing to establish a full record" (citing 8 U.S.C. § 1229a(b)(1))); *Al Khouri v. Ashcroft*, 362 F.3d 461, 464 (8th Cir. 2004) ("[W]hen an alien appears pro se, it is the IJ's duty to fully develop the record." (internal quotation marks omitted)); *Oshodi v. Holder*, 729 F.3d 883, 889 (9th Cir. 2013) ("[W]here an applicant is not represented, the IJ has an affirmative duty to ensure that the record is fully developed for the benefit of the applicant."); *see also Na Zheng v. Holder*, 507 F. App'x 755, 762 (10th Cir. 2013) ("[T]he IJ . . . has some duty to develop the record."). For purposes of this appeal only, we will assume that there is a duty to develop the record for a pro se applicant.

To prevail on this argument, Petitioner must identify evidence that the IJ should have elicited that would have altered the BIA's finding that he was firmly resettled in Angola. *See Berrum-Garcia v. Comfort,* 390 F.3d 1158, 1165 (10th Cir. 2004) (requiring

15

showing of prejudicial error to establish due-process violation).  But he argues only that the IJ should have inquired more deeply into his "adoption" and resultant name change, and that she should have asked whether he "legally changed his name or could otherwise lawfully use a passport under someone else's name to return to Angola."  Aplt. Br. at 45. Except for the ability to reenter, however, none of this evidence would alter the applicability of *Matter of D-X- & Y-Z-*, which allows fraudulently obtained documents to serve as prima facie evidence of firm resettlement.  And even on appeal he does not offer any evidence that he would have been denied reentry with the Angolan passport issued to him.  As he points to no testimony or other evidence that could undermine the facial validity of the passport as an offer of firm resettlement under *Matter of D-X- & Y-Z-*, he cannot establish that the IJ's development of the record was prejudicially inadequate.

## C.    Withholding of Removal

An applicant seeking withholding of removal must "establish a clear probability of persecution in that country on the basis of race, religion, nationality, membership in a particular social group, or political opinion."  *Elzour*, 378 F.3d at 1149 (citing 8 U.S.C. § 1231(b)(3)(A)).  "[S]uch persecution [must be] more likely than not."  *Id.*  "If the applicant is determined to have suffered past persecution . . . , it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim."  8 C.F.R. § 1208.16(b)(1)(i).  The term *persecution* is not defined in the Immigration and Nationality Act, but this court has held that persecution "requires the infliction of suffering or harm . . . in a way regarded as offensive and requires more than just restrictions or threats to life and liberty."

16

*Woldemeskel*, 257 F.3d at 1188 (internal quotation marks omitted). Unlike in an asylum claim, "firm resettlement in a third country is not a bar to restriction on removal." *Elzour*, 378 F.3d at 1149.

### 1. Past Persecution

The BIA concluded that Petitioner's "perceived need to hide for short periods of time in the DRC and his resettlement in Angola did not constitute past 'persecution,'" even accepting his testimony that the government looked for him after the 2013, 2014, and 2015 demonstrations. CAR 5. The BIA further noted that Petitioner testified before the IJ "that he was not harmed or personally threatened with violence in the DRC." CAR 5. On appeal Petitioner contends the BIA erred by effectively concluding he was not persecuted because he was never physically harmed. But the BIA did not rely on any physical-harm requirement; rather, it merely determined that Petitioner had not experienced persecution by going into hiding for fear of being arrested or otherwise harmed. We see no error.

Petitioner relies on our statement that threats can "constitute actual persecution . . . when they are so immediate and menacing as to cause significant suffering or harm in themselves." *Vatulev v. Ashcroft*, 354 F.3d 1207, 1210 (10th Cir. 2003). But that standard is very difficult to satisfy. *Vatulev* said that "only rarely" do threats constitute actual persecution, *id.*, and in neither of the two cases we cited in support of our statement—*Mendez-Gutierrez v. Ashcroft*, 340 F.3d 865, 869 n.6 (9th Cir. 2003), and *Boykov v. INS*, 109 F.3d 413, 416 (7th Cir. 1997)—did the court decide that the threats alone constituted persecution. Indeed, the cited footnote in *Mendez-Gutierrez* included

17

the following citation and parenthetical in support of the proposition that unfulfilled threats standing alone rarely establish persecution:  "*Lim v. INS*, 224 F.3d 929, 936 (9th Cir. 2000) (finding that alien who had received numerous death threats, and whose colleagues were murdered by the military, had not suffered past persecution)."  We think our circuit precedent is clear that the BIA did not err in deciding that there was no past persecution in this case.  Even if we believed that the out-of-circuit opinions cited in Petitioner's briefs would support his claim and are persuasive, we are bound by circuit precedent.

We note, however, that this does not mean that Petitioner's account of why he fled the DRC is irrelevant.  As we stated in *Vatulev*, "[U]nfulfilled threats are still properly considered in determining whether a petitioner has a reasonable fear of future persecution."  354 F.3d at 1210.  In particular, as we explain below, we are remanding this case to the BIA for further consideration of Petitioner's claim that his fear of future persecution is based on a pattern or practice of the DRC government, and his testimony is relevant on that issue.

Petitioner also contends that the IJ failed to sufficiently develop the record on past persecution.  We disagree.  The IJ, together with the government attorney, adequately asked questions that gave Petitioner the opportunity to provide the testimony he claims should have been elicited.  For example, he argues that he had no chance to explain that state security officials repeatedly searched for him after he participated in opposition marches.  But he was asked multiple times what happened to him, if anything, because of the marches he participated in.  Petitioner also claims that he was not prompted to share

18

that two fellow UPDS organizers were arrested and disappeared. His testimony and asylum application, however, both stated that several fellow organizers and participants were killed at the marches and others were hunted afterwards. As a final example, Petitioner argues that he was not given an opportunity to explain that Angolan security officers were looking for him and that his beliefs would cause him to be harmed there. But this ignores that he was specifically asked whether he had any problems in Angola, and that he answered in the negative. The IJ adequately developed the record on past persecution.

### 2. Future Persecution

"The restriction statute is satisfied by a showing that it is more likely than not that the alien would be subject to persecution on one of the specified grounds upon returning to [his] country of origin." *Tulengkey v. Gonzales*, 425 F.3d 1277, 1280 (10th Cir. 2005) (internal quotation marks omitted). While an applicant who demonstrates past persecution is entitled to a presumption of future persecution, *see* 8 C.F.R. § 208.16(b)(1)(i), the failure to show past persecution does not bar an independent showing of future harm, *see id*. The likelihood of future persecution can be established by showing either (1) an *individualized* risk of harm upon return, or (2) "a *pattern or practice* of persecution of a group of persons similarly situated to applicant on account of race, religion, nationality, membership in a particular social group, or political opinion," and that the applicant belongs to and identifies with the group "such that it is more likely

19

than not than his or her life or freedom would be threatened upon return to that country."

*Id.* (emphasis added).[6]

The BIA rejected any claim based on the first alternative—an individualized risk of harm. It ruled that Petitioner did not demonstrate a *clear probability* of future persecution because he could not show "a continued government interest in him since his departure from the DRC in 2015." CAR 5. It further observed that Petitioner's ability to return to a relatively normal life in the DRC after his participation in the 2013 and 2014 marches undermined his claim. Petitioner does not suggest that the BIA overlooked evidence of individualized risk, but he argues that having to prove that the DRC government still has an interest in him was "an impossible standard" given his inability to obtain evidence while detained in the United States. Aplt. Br. at 41. If there had been interest in him, however, one would expect that to be apparent to his family and

---

[6] The pattern-or-practice regulation states:

> (2) In evaluating whether it is more likely than not that the applicant's life or freedom would be threatened in a particular country on account of . . . political opinion, the asylum officer or immigration judge *shall not require the applicant to provide evidence that he or she would be singled out individually for such persecution if:*
>
> (i)    The applicant establishes that in that country there is a pattern or practice of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and
>
> (ii)   The applicant establishes his or her own inclusion in and identification with such group of persons such that it is more likely than not that his or her life or freedom would be threatened upon return to that country.

8 C.F.R. § 208.16(b) (emphasis added).

associates in the DRC, who could have communicated this to him after his departure from the DRC in 2015. In any event, a claim for withholding of removal must be based on evidence, not speculation.

Petitioner fares better on his argument that he has made a showing of future persecution based on a pattern or practice of persecution. The BIA did not address whether the evidence was sufficient to establish a pattern-or-practice claim. It stated its ruling only in terms of individualized risk. *See* CAR 5 ("[Petitioner] has not provided sufficient evidence to demonstrate a continued government interest *in him* since his departure from the DRC in 2015, so as to establish that he will more likely than not face future persecution." (emphasis added)). The government argues that Petitioner failed to exhaust a pattern-or-practice claim by not presenting it to the BIA. *See Torres de la Cruz v. Maurer,* 483 F.3d 1013, 1017 (10th Cir. 2007) ("We have jurisdiction only over those claims that were presented to the BIA."); 8 U.S.C. § 1252 (d)(1). We disagree.

Petitioner contended in his first BIA brief that the IJ's findings on the likelihood of future persecution were incorrect because:

> As Mr. Matumona's testimony and the country conditions evidence demonstrate, the Congolese government continues to subject opposition activists and political opponents to arbitrary arrests, disappearances, torture, and death. . . . Based on the *current* country conditions, *Mr. Matumona, as a community organizer for the UDPS, has a well-founded fear of future persecution* even two years after having left the country. . . .

> Based on the past threats and psychological abuse [he] has suffered, *along with the current country conditions evidence that the government continues to target opposition activists with impunity clearly establishes that [he] has a well-founded fear of persecution.* And this evidence also establishes that he can meet the higher "clear probability" standard of future persecution in the withholding of removal context.

21

CAR 367–68 (emphasis added). The italicized language bases his fear-of-future-persecution claim on the DRC's treatment of other dissidents. The risk of harm that may befall an applicant if he resumes protected conduct as a member of a social or political group can support a pattern-or-practice claim. *See Velasquez-Banegas v. Lynch*, 846 F.3d 258, 261 (7th Cir. 2017) (under the pattern-or-practice regulation, "to be a member of a group that faces a high probability of persecution in a foreign country is enough to establish that he's at risk of persecution if deported to that country," even if the petitioner could not establish that he, specifically, was at risk of harm).

In his brief on remand to the BIA, Petitioner repeated his argument that the IJ erred in assessing future persecution because:

> Country-conditions evidence showed that the DRC continues to target UDPS members. For example, the State Department's country report specifically discussed a 2016 assault on the UDPS, in which security forces fire-bombed UDPS headquarters, killing eleven members, seven of whom "burned to death, possibly after being tortured and hacked with machetes." (ROA-385). Mr. Matumona's own experiences were consistent with this objective evidence. Accordingly, the BIA erred in finding that he did not face a clear probability of persecution if returned to the DRC.

CAR 37.

When the BIA "has failed to address a ground raised by an applicant in support of [his] claim, we should ordinarily not reverse on that ground but should instead remand if the ground appears to have any substance." *Niang v. Gonzales*, 422 F.3d 1187, 1197 (10th Cir. 2005). On remand the BIA can address whether the pattern-or-practice issue

22

was preserved before the IJ, can address the merits, and may consider evidence about present conditions in the DRC.[7]

### D. Additional Procedural Arguments

Petitioner raises additional claims that he is entitled to relief because of violations of his due-process and statutory procedural rights. As a matter of due process, aliens are entitled to "the opportunity to be heard at a meaningful time and in a meaningful manner." *Schroeck v. Gonazles*, 429 F.3d 947, 952 (10th Cir. 2005) (internal quotation marks omitted). To prevail on a due-process challenge, the petitioner must show prejudicial error. *See Berrum-Garcia*, 390 F.3d at 1165.

First, Petitioner claims that his inability to understand and speak English impeded his ability to present his case and the IJ should have taken steps to enable him to adequately proceed. But the factual record belies this assertion, with respect to both his asylum application and the merits hearing. There was nothing more for the IJ to do regarding Petitioner's application. After Petitioner expressed at his initial hearing his concern about having to complete his application in English, the IJ stated that "we'll probably have to find someone to help you," and that this would be discussed further at Petitioner's next master-calendar hearing. CAR 441. But by the time of that hearing,

---

[7] The government at oral argument asked us to take judicial notice of the presidential election in the DRC on December 30, 2018, and the resultant change in leadership. It claims that the change undermines Petitioner's fear of future persecution because it was "favorable" to Petitioner's views. But "[w]e are not at liberty to search for grounds to affirm that were not relied on by the agency." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1205 (10th Cir. 2006). The agency must be the first to consider the effect of this election, if any, on Petitioner's claim.

which was less than three weeks after his first hearing, Petitioner had already submitted a completed asylum application. A French-speaking volunteer had helped him complete his application. Although Petitioner did not receive the aid of a volunteer who spoke Lingala, his native language, his asylum application indicates that he speaks French fluently. The IJ also properly addressed at the merits hearing the inability of Petitioner to speak or understand English. He was provided a satisfactory Lingala interpreter at the hearing, enabling him to follow the proceedings and testify in his native language. Although Petitioner contends that his right to present evidence was impaired by his lack of access to translated evidence, he points to no prejudice that he suffered. His briefs do not identify any particulars that could have assisted him at the hearing. In other words, he makes no argument that with specified translated evidence he could have raised an argument or claim that was not made before the IJ and could have altered the outcome.

Petitioner next claims that the conditions of his confinement obstructed his statutory right to counsel. *See* 8 U.S.C. § 1229a(b)(4)(A) ("[T]he alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing"). On the record before it, the BIA properly rejected this claim. At Petitioner's first appearance before the IJ, the IJ advised him of his rights, including his right to have an attorney at no expense to the government. The IJ inquired whether Petitioner had already received the list of legal-aid attorneys who could represent him for free or at a reduced rate and asked a court officer to give him a copy of the list. Petitioner responded: "Okay, this list here, when you call people, they don't answer. They don't pick up the phone. A lot of people are calling them but nobody is picking up their

24

phones." CAR 438.  At the merits hearing Petitioner had still not obtained an attorney, but he did not request more time to obtain counsel and he stated that he wanted to proceed with the hearing, even though the IJ repeatedly indicated her willingness to continue the hearing.  We agree with the BIA that the fact that legal-aid providers did not answer Petitioner's calls does not establish a due-process violation by the government.

Petitioner argues that he could not obtain an attorney because he did not have access to a phone.  But the record indicates otherwise.  He stated, "[W]hen you call people, they don't answer.  They don't pick up the phone."  CAR 438.  He points to his statement that he did not have a phone; but we read his comments as saying that his custodians took his personal phone and did not give him another one, not that they did not provide access to any phone.[8]

---

[8] The relevant exchange between the IJ and Petitioner at his May 2, 2017 master calendar hearing regarding phone access was as follows:

> Judge to Mr. Matumona:  Well, are they allowing you to use the telephone, sir?
>
> Mr. Matumona:  They don't give me a phone.  That's – okay.  They don't give me a phone, that's why I think I'm going to be mentally sick because I don't have anybody.  I'm in the prison right now.  I don't have anybody to call, to help me.  I don't have anybody.
>
> Judge:  Okay.  So you don't know anybody in the United States, sir?
>
> Mr. Matumona:  No, I don't have anybody.  On my phone, I have all the numbers, it turn off and then it's in their hands.  Maybe I could have found a number over there and called but all my phone is in their hands.
>
> Judge:  Okay.  And, sir, I want to make sure you have the legal aid list.  Let me ask the officer to give you another copy of that if you haven't already received it.
>
> Mr. Matumona:  Okay, this list here, when you call people, they don't answer.  They don't pick up the phone.  A lot of people are calling them but nobody is picking up their phones.

CAR 437–38.

25

Petitioner further argues that he was deprived of his right to obtain counsel because of the remoteness of his detention facility in Milan, New Mexico, and the dearth of attorneys in the area who could have represented him at his merits hearing. But there is no factual support in the record for this argument. Before the BIA and here he relies on a written statement by a New Mexico attorney labeled as the attorney's "Affidavit." But the label is incorrect. The statement was not sworn or made under penalty of perjury. As the BIA correctly stated, assertions by counsel are not evidence. We therefore must reject this argument.

Finally, Petitioner complains that the BIA improperly rejected his due-process claims by stating that it lacked jurisdiction to address them. This complaint is misguided. The BIA addressed the merits of Petitioner's due-process arguments insofar as they concerned his challenge to the decision by the IJ. It then stated: "In addition, this Board does not have jurisdiction over complaints related to the conditions of [Petitioner's] detention, including the adequacy of his facility's telephones and law library. Our authority to protect an alien's rights cannot extend beyond the scope of our appellate jurisdiction." CAR 154. All the BIA was saying is that its jurisdiction was limited to resolving Petitioner's appeal and it could not independently take action to correct problems with his detention. It is an appellate tribunal, not a venue for overseeing the treatment of aliens. *See* 8 C.F.R. § 1003.1(b) (delineating scope of BIA's appellate authority). The BIA has explained: "Of course, this Board is empowered to find that a violation of the statutes or regulations has infringed upon an alien's procedural rights, which may in turn affect determinations regarding deportability, . . . or other benefits

26

under the immigration laws.  However, this authority exists only to the extent that it is encompassed by our appellate jurisdiction."  *Matter of Hernandez-Puente*, 20 I. & N. Dec. 335, 339 (BIA 1991); *see Matter of Rahman*, 20 I. & N. Dec. 480, 484 n.4 (BIA 1992) (concerns regarding place of detention are outside IJ and BIA authority).

### III.    CONCLUSION

We **AFFIRM** on all grounds raised by Petitioner except that we **REVERSE** and **REMAND** for further proceedings to consider Petitioner's pattern-or-practice argument. We **GRANT** Petitioner's motion to proceed in forma pauperis.