**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-2511**

GHENET DEBESAI NAIZGHI,

Petitioner,

v.

LORETTA E. LYNCH, Attorney General,[1]

Respondent.

**No. 14-1530**

GHENET DEBESAI NAIZGHI,

Petitioner,

v.

LORETTA E. LYNCH, Attorney General,

Respondent.

On Petitions for Review of Orders of the Board of Immigration
Appeals.

Argued: October 30, 2014            Decided: September 10, 2015

---

[1] Loretta E. Lynch is substituted as Respondent for her
predecessor, Eric H. Holder Jr., as Attorney General of the
United States. See Fed. R. App. P. 43(c)(2).

---

Before TRAXLER, Chief Judge, and KING and THACKER, Circuit Judges.

---

Petitions for review denied by unpublished per curiam opinion. Chief Judge Traxler wrote a dissenting opinion.

---

**ARGUED:** Monalisa Dugue, Geoffrey James Heeren, VALPARAISO UNIVERSITY LAW CLINIC, Valparaiso, Indiana, for Petitioner. Corey Leigh Farrell, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Sara Dietrich, Cecilia Lopez, Michelle Prasad, VALPARAISO UNIVERSITY LAW CLINIC, Valparaiso, Indiana, for Petitioner. Joyce R. Branda, Acting Assistant Attorney General, Terri J. Scadron, Assistant Director, Civil Division, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Ghenet Debesai Naizghi ("Petitioner") fled Eritrea in 1994, lived in Italy until 2009, and then applied for United States asylum status in 2010. The Government opposed Petitioner's request for asylum, arguing that she was firmly resettled in Italy and, therefore, barred from asylum relief. Specifically, the Government argued that Petitioner was firmly resettled because she was eligible to apply for Italian citizenship; secured an Italian work permit; and was able to travel, work, and obtain medical care in Italy. For these reasons, the Immigration Judge ("IJ") and the Board of Immigration Appeals ("Board") denied Petitioner's request. Petitioner sought review by this court. Because we believe the Board's decision is supported by substantial evidence, we deny the petitions for review.

## I.

Petitioner and her family are Pentecostal Christians, and Petitioner's father was a Pentecostal preacher. Because of their religion, Petitioner and her family suffered persecution by the Eritrean government. In 1993, Eritrean soldiers abducted Petitioner's father, and in 1994, soldiers forcibly entered Petitioner's home and abducted her brother. Petitioner has not seen or heard from her father or brother since.

3

Petitioner obtained travel documents and fled to Italy in 1994. She had no legal status and no family or social connections in Italy when she arrived. She managed to find work as a housekeeper and eventually applied for asylum. But for reasons absent from the record, the Italian government denied her asylum application. Therefore, Petitioner resided in Italy unlawfully from 1994 to 1996. Petitioner applied for a living subsidy from the Italian government, which was also denied. In 1996, Petitioner obtained a temporary work permit, which initially had to be renewed every year but later became renewable every other year. According to Petitioner's testimony during her asylum hearing, she was required to show proof of employment and to pay taxes in order to renew the temporary work permit. Nonetheless, even at times when Petitioner was not employed, Italy consistently renewed her work permit over a period of 12 years. As such, Petitioner was able to reside in Italy from 1996 to 2008 on a string of temporary work permits. When she could afford rent, Petitioner rented a room in an apartment; when she could not, she lived with a nun.

Although her testimony was not supported with specific references to Italian law, Petitioner testified that Italian law permits individuals who have resided in Italy for ten years to apply for citizenship. Thus, Petitioner claims she became eligible to apply for Italian citizenship in 2004. Two years

4

later, in 2006, Petitioner applied for citizenship. According to Petitioner's uncontroverted testimony, to complete the application process she was "required . . . to go to the embassy of Italy in Eritrea and have [a] document translated and authenticated." A.R. 150.[2] Fearing that returning to Eritrea would expose her to the same fate that befell other members of her family, Petitioner submitted her application with all required forms except the authenticated document. Italy eventually rejected Petitioner's citizenship application -- its reason for doing so is not in the record. However, Petitioner remained in Italy on her temporary work permit.

In 2008, while still in Italy, Petitioner was raped by patrons of the restaurant where she worked. By virtue of her temporary work permit, she received medical care at an Italian hospital. Petitioner's testimony as well as the IJ's findings indicate that the Italian government covered her medical expenses. Following the sexual assault, Petitioner traveled back to Eritrea on August 6, 2008, to be with her mother. At the time, she did not intend to return to Italy. While in Eritrea, Petitioner did not attempt to obtain the required form needed for Italian citizenship.

---

[2] Citations to the "A.R." refer to the Administrative Record filed by the parties in this appeal.

5

On August 18, 12 days after she arrived in Eritrea, Petitioner was attending a prayer meeting at her mother's home. Government soldiers interrupted the meeting and demanded to question Petitioner. When she hesitated to comply, the soldiers dragged Petitioner out of the house and beat her. The soldiers then took her to another location, where they held her captive in a small, poorly ventilated structure. They beat, sexually assaulted, and starved her for eight days before her mother was finally able to successfully bribe the soldiers to release her.

On September 8, 2008, Petitioner fled once again to Italy, intending to use the country as a stepping-stone for entry into the United States. She arrived with no job, but she was later able to resume work as a housekeeper pursuant to her temporary work permit, which remained active. In February 2009, the United States granted Petitioner a B-2 travel visa for a period of seven months. She left Italy for the United States on June 1, 2009. At that point, Petitioner had spent approximately 14 years in Italy. Petitioner claims that after coming to the United States, her Italian legal documents, including her temporary work permit, were stolen.

Petitioner applied for asylum in the United States on March 4, 2010.[3] The Government served Petitioner with a Notice to Appear on April 20, 2010, alleging she had overstayed her B-2 travel visa. Petitioner appeared before the IJ on April 30, 2012, and conceded her removability, but she requested asylum and withholding of removal. The Government did not oppose withholding of removal, but argued that Petitioner was subject to the firm resettlement bar to asylum. The Government relied on Petitioner's testimony regarding Italy's citizenship application process, the amount of time she lived in Italy, the renewal of her work permit, and her ability to receive subsidized medical care.

The IJ granted Petitioner's application for withholding of removal but denied her asylum petition because it concluded that she had been firmly resettled in Italy before arriving in the United States and was, therefore, barred from asylum relief. On November 25, 2013, the Board affirmed the IJ's finding of firm resettlement, providing its own analysis.

---

[3] By this point, Petitioner had overstayed her travel visa by two months, and during that time, she had not attempted to even begin the asylum process in the United States.

Petitioner filed a timely petition for review with this court on June 4, 2014.[4]

## II.

When the Board affirms the IJ's opinion and supplements the IJ's reasoning, as it did here, we review both opinions. See Cordova v. Holder, 759 F.3d 332, 337 (4th Cir. 2014). We review for substantial evidence a Board's decision that an individual is firmly resettled. See Mussie v. U.S. Immigration & Naturalization Serv., 172 F.3d 329, 331 (4th Cir. 1999). Under this standard, we treat the Board's findings as conclusive "unless any reasonable adjudicator would be compelled to conclude to the contrary." Cordova, 759 F.3d at 337 (internal quotation marks omitted).

## III.

### A.

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") statutorily bars an alien from being eligible for asylum if he or she was "firmly resettled in another country prior to arriving in the United

---

[4] Petitioner filed two petitions for review. The first, No. 13-2511, sets forth the arguments outlined in this opinion. The second, No. 14-1530, was filed in response to the Government's motion to dismiss for lack of jurisdiction, which was denied. The second petition for review does not add any substantive arguments for our review.

States." 8 U.S.C. § 1158(b)(2)(A)(vi). Although IIRIRA does not define the term "firm resettlement," the Code of Federal Regulations fills this definitional gap, defining "firm resettlement" as follows:

> An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement . . . .

8 C.F.R. § 1208.15. Additionally, the Board has provided a framework to streamline the case-by-case adjudication of asylum claims pursuant to this definition of firm resettlement. See Matter of A-G-G-, 25 I. & N. Dec. 486, 500-03 (B.I.A. 2011).

The Board's framework consists of four steps. In step one, the government proffers prima facie evidence that the petitioner has been firmly resettled in a third country. See A-G-G-, 25 I. & N. Dec. at 501. If the government fails to present a prima facie case of an offer of permanent residence, the inquiry ends. If the government succeeds, then the court moves on to step two, which shifts the burden to the asylum applicant to show "by a preponderance of the evidence that such an offer has not, in fact, been made or that he or she would not qualify for it." Id. at 503. Then, in step three, the IJ evaluates the totality of the evidence to determine whether the applicant has, in fact, rebutted the government's proffer. See

9

id. If the IJ determines the applicant effectively rebutted the government's case, the applicant may be granted asylum. See id. But if the applicant has failed, the IJ proceeds to step four, and the applicant must establish that she meets one of the regulatory exceptions to a finding of firm resettlement.[5] See id.

At the first step, the Government bears the initial burden of proffering prima facie evidence of firm resettlement. See A-G-G-, 25 I. & N. Dec. at 501. According to A-G-G-, the Government may carry its burden preferably via direct evidence or, in the absence of direct evidence, via sufficiently clear and forceful indirect evidence:

> In order to make a prima facie showing that an offer of firm resettlement exists, the [government] should first secure and produce direct evidence of governmental documents indicating an alien's ability to stay in a country indefinitely. Such documents may include evidence of refugee status, a passport, a travel document, or other evidence indicative of permanent residence.
>
> If direct evidence of an offer of firm resettlement is unavailable, indirect evidence may be used to show that an offer

---

[5] There are two regulatory exceptions to the firm resettlement bar: the alien remained in the third country only for so long as necessary to secure onward travel, or the third country "substantially and consciously restricted" the alien's residence such that "he or she was not in fact resettled." 8 C.F.R. §§ 1208.15(a), (b).

10

of firm resettlement has been made if it has a sufficient level of clarity and force to establish that an alien is able to permanently reside in the country. Indirect evidence may include the following: the immigration laws or refugee process of the country of proposed resettlement; the length of the alien's stay in a third country; the alien's intent to settle in the country; family ties and business or property connections; the extent of social and economic ties developed by the alien in the country; the receipt of government benefits or assistance, such as assistance for rent, food, and transportation; and whether the alien had legal rights normally given to people who have some official status, such as the right to work and enter and exit the country.

Id. at 501-02 (footnote omitted).

This test "focuses exclusively on the existence of an offer." A-G-G-, 25 I. & N. Dec. at 501. Indirect evidence is not afforded weight equal to that afforded to direct evidence: "according equal weight to indirect evidence, such as the country's residence laws, length of an alien's residence in an intervening country, or the alien's intent, is inconsistent with the fact that only the government of the intervening country can grant an alien the right to lawfully and permanently reside there." Id. Nonetheless, indirect evidence may circumstantially demonstrate that the alien was offered permanent residence status, and the legal rights it entails, by a foreign country if "it has a sufficient level of clarity and force." Id. at 502.

11

While the Board did not mention what forms of indirect evidence are sufficient to prove firm resettlement, alone or in combination, it did indicate that some types of evidence carry less weight than others. For example, the Board held that a lengthy period of residence in a third country cannot, by itself, establish a prima facie case of firm resettlement. Cf. A-G-G-, 25 I. & N. Dec. at 501 ("Such a right 'cannot be gained through adverse possession.'" (quoting Abdille v. Ashcroft, 242 F.3d 477, 487 (3d Cir. 2001))). However, the Board made clear that "[t]he existence of a legal mechanism in the country by which an alien can obtain permanent residence may be sufficient to make a prima facie showing of an offer of firm resettlement." Id. at 502 (emphasis in original). Furthermore, section 1208.15 "only require[s] that an offer of firm resettlement was available, not that the alien accepted the offer." Id. at 503. The Board justified this rule as necessary to protect "the purpose of the firm resettlement bar, which is to limit refugee protection to those with nowhere else to turn." Id.

## B.

We have held that when an agency interprets its own regulation, "the agency's interpretation controls unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'" Dickenson-Russell Coal Co., LLC v. Sec'y of Labor, 747 F.3d 251, 257 (4th Cir. 2014) (quoting Auer v. Robbins, 519

12

U.S. 452, 461 (1997)).  The parties agree that the Board's decision in A-G-G- is "a reasonable interpretation of the firm resettlement statute and regulation, and should be given deference."  Gov't's Br. 23 n.3; see also Pet'r's Br. 20.  We also agree.

C.

Applying the Board's framework as laid out in A-G-G-, substantial evidence supports the Board's conclusion that Petitioner was firmly resettled in Italy.  The Government offered sufficient indirect evidence[6] to present a prima facie case that Petitioner was firmly resettled in Italy before arriving in the United States, and Petitioner did not sufficiently rebut that evidence.

In order to make its prima facie case, the Government offered Petitioner's uncontroverted testimony that, by virtue of her ten-year stay in Italy, she was eligible to apply for citizenship pursuant to Italian citizenship law.  The Government also proffered the duration of Petitioner's stay in Italy; her temporary work permit, which she renewed several times; her ability to travel pursuant to the permit; her receipt of government subsidized medical care as a work permit holder; and

---

[6] Neither party argues that the Government provided direct evidence.  Thus, we proceed under the indirect evidence analysis.

13

her ability to obtain housing. This evidence is sufficient to shift the burden to Petitioner. See Mussie v. United States Immigration & Naturalization Service, 172 F.3d 329, 332 (4th Cir. 1999) ("A duration of residence in a third country sufficient to support an inference of permanent resettlement in the absence of evidence to the contrary shifts the burden of proving absence of firm resettlement to the applicant." (quoting Cheo v. INS, 162 F.3d 1227, 1229-30 (9th Cir. 1998))); Hanna v. Holder, 740 F.3d 379, 394 (6th Cir. 2014) (concluding that testimony of a petitioner and her father that the petitioner was granted "landed immigrant status" in Canada was enough for the Government to satisfy its prima facie case).

At A-G-G- steps two and three, we believe substantial evidence supports the Board's conclusion that Petitioner did not rebut the prima facie case of firm resettlement "by a preponderance of the evidence." 25 I. & N. Dec. at 503. Petitioner provided scant evidence that she did not receive an offer of citizenship from Italy or that she would not qualify for citizenship. See id. Indeed, we find specious her argument that she was unable to complete Italy's citizenship process because she could not obtain a required form from Eritrea, but she then returned to Eritrea and still did not obtain the proper paperwork. Therefore, we cannot say that a "reasonable

14

adjudicator would be compelled to conclude" that Petitioner was not firmly resettled in Italy.  <u>Cordova</u>, 759 F.3d at 337.

## IV.

For the foregoing reasons, we deny the petitions for review.

<u>PETITIONS FOR REVIEW DENIED</u>

TRAXLER, Chief Judge, dissenting:

With respect to the views of my distinguished colleagues, I would grant the petition for review.  In my view, Naizghi rebutted the Government's evidence of an Italian offer of permanent status.  She testified without contradiction that the Italian application process required her to return to Eritrea, the country from which she was fleeing persecution, and submit various authenticated documents through the Italian Embassy there.  In my opinion, this is not an offer of permanent status by Italy.  The fact that Naizghi retreated to Eritrea to be with her family after being raped in Italy and subsequently returned to Italy without the required paperwork does not convince me otherwise.  Twelve days after her arrival, Naizghi was abducted by the government from a prayer meeting and subjected to a variety of abuses by her captors.  After her mother secured her release by bribing officials, Naizghi returned to Italy.  In my opinion, it would be unreasonable to expect her to remain in Eritrea to secure documentation.  Accordingly, Naizghi satisfied her burden of rebutting the Government's prima facie case.  I therefore would grant Naizghi's petition for review and allow her to continue seeking asylum in this country.