# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 1, 2022

Lyle W. Cayce
Clerk

No. 20-60527

Sanjar Muminov,

*Petitioner*,

*versus*

Merrick Garland, U.S. Attorney General,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals
BIA No. A201 665 663

Before Owen, *Chief Judge*, and Higginbotham and Elrod, *Circuit Judges*.

Per Curiam:*

Sanjar Muminov, a native and citizen of Uzbekistan, challenges an order by the Board of Immigration Appeals (BIA) rejecting his claims for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). We DENY the petition for review.

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 20-60527

**I**

Muminov entered the United States without authorization in 2019. The Department of Homeland Security (DHS) issued Muminov a Notice to Appear charging that he was subject to removal. Muminov expressed concerns about removal and was referred to an immigration officer for a credible-fear interview. Muminov then appeared before an immigration judge (IJ) for a hearing. He conceded his removability and applied for asylum, withholding of removal, and CAT relief.

During the hearing, Muminov testified about a series of attacks and harassment that he allegedly endured. While living in Uzbekistan, in 2008, Muminov said that he was assaulted by his wife's ex-husband, Sanjar Norimkulov, and two of Norimkulov's friends. Muminov claimed that Norimkulov is a prosecutor and that his two friends also worked in law enforcement. The attackers allegedly told Muminov that he should not have married his wife. Muminov said that they beat him and stabbed him in the back with a broken bottle. A bystander called the police, who allegedly released the attackers but imprisoned Muminov for three days.

After the attack, Muminov testified, he fled to Moscow with his wife and lived there for eight years. During that time, the couple had two children. Muminov allegedly paid for a work permit and started a delivery business with his wife. Muminov said that it was difficult to live in Russia as an Asian man. He claimed that he could not operate his business in his own name but rather relied on two Russian business partners, who allegedly stole profits from the business, beat him up twice, and told him to leave Moscow. He said that he was required to pay a recurring fee to the police to live in Moscow.

Muminov also testified that he had been a victim of crime in Russia. He claimed that he had two cars stolen while he was in Moscow. When he complained about the theft, the police allegedly investigated him. He

2

reported that Russian nationalists attacked him in the subway on two occasions. Muminov claimed that police witnessed one of the attacks and ignored it. According to Muminov, these responses were characteristic of police discrimination against Asian people.

In 2016, Muminov testified, he and his family returned to Uzbekistan because of their difficulties in Russia and because his mother was ill. Soon thereafter, Muminov was summoned to a police station, where an inspector allegedly confiscated his passport and said he would need to pay to get it back. Muminov testified that he and four friends protested the government's unlawful confiscation of passports outside a ministry office. After learning that Muminov was under investigation, police allegedly beat him and imprisoned him overnight. Muminov said that the police released him with a warning that he would regret any future protests. Muminov did not describe this protest or the beating in his credible-fear interview.

Muminov testified that Norimkulov continued to threaten him. In 2017, Muminov said, he tried to file a complaint with the police against Norimkulov and Norimkulov's uncle, a government official who Muminov believed to be protecting Norimkulov and promoting corruption. The police allegedly laughed at Muminov, forced him to take off his clothes, put a bag over his head so he could not breathe, and beat his arms and legs with batons. Muminov testified that he was imprisoned for three days. During his credible-fear interview, Muminov had not clearly indicated that his complaint pertained to government corruption. He had said his complaint "was about the ex-husband not leaving me alone and that the police would always take his side and not mine."

After this incident, Muminov testified, he was again called to a police station. The officers allegedly told him that he would be summoned in the future and needed to remain in the city. As Muminov left the station, he said,

he was confronted by Norimkulov and his friends, who beat him up again. The attackers allegedly told Muminov that they knew he had tried to report Norimkulov's uncle and that Muminov was a traitor who had no right to live in Uzbekistan. Upon seeing his injuries, Muminov's family called an ambulance. The hospital determined that Muminov had a concussion and facial, eye, and ear wounds. Medical records show that Muminov also had depression and had attempted suicide.

Muminov testified that his car was subsequently vandalized. He claimed that the perpetrators left a sign on the car that said, "That's how we'll break you." Following the vandalism, in February 2018, Muminov allegedly went to the police, who interrogated him. Muminov testified that an officer put a gun to his head and told him to leave Uzbekistan. Muminov had not described the vandalism or the subsequent encounter with police in his credible-fear interview.

In March 2018, Muminov said, he fled to Moscow, where he lived for ten months. While in Moscow, he allegedly attempted to restart his business but left for the United States after his former business partners discovered that he had returned to Russia. Muminov testified that he could not obtain Russian citizenship and feared living in Russia.

The IJ considered Muminov's testimony at the hearing partially credible, given his truthful demeanor and the general consistency between his statements and documentary evidence. But she rejected his testimony about harm he had suffered on political grounds. The IJ deemed this testimony inconsistent with Muminov's statements in his credible-fear interview. Nor did she find any other evidence to corroborate Muminov's testimony that he was attacked for protesting government corruption.

The IJ denied all of Muminov's claims for relief. She held that Muminov was ineligible for asylum because he had firmly resettled in Russia.

She also rejected Muminov's claim for withholding of removal based on political opinion. Having discredited Muminov's testimony that he was attacked for protesting government corruption, the IJ found no evidence that Muminov had been persecuted on political grounds. She concluded that Muminov suffered harm because of his personal dispute with Norimkulov over Muminov's wife. The IJ denied the CAT claim because the attacks by the government, even if they all had occurred, were not severe enough to constitute torture and because the attacks by Norimkulov were not done under official sanction.

Muminov appealed to the BIA, which adopted the IJ's decision and supplemented its reasoning. The BIA agreed that Muminov's testimony about the harm he suffered on political grounds was not credible because it was inconsistent with his statements in his credible-fear interview. During the interview, the BIA noted, Muminov had not described any harm unconnected to Norimkulov, with whom his conflict was merely personal.

The BIA affirmed the denial of each claim for relief. On the asylum claim, the BIA held that Muminov had firmly resettled in Russia. On the claim for withholding of removal, the BIA agreed that Muminov had not credibly established that he was attacked on political grounds. On the CAT claim, the BIA determined that Muminov had waived his application because he had not meaningfully challenged the IJ's denial of CAT relief.

Muminov filed a timely petition for review by this court. His appeal raises two issues. First, Muminov argues that the IJ and BIA erred in discrediting his testimony that he was attacked for protesting corruption. Second, Muminov argues that the IJ and BIA erred in determining that Muminov had firmly resettled in Russia.

No. 20-60527

## II

"We review the BIA's decision, and we review the IJ's decision only to the extent it influenced the BIA."[1]  "However, this court may review the IJ's findings and conclusions if the BIA adopts them."[2]  Because the BIA adopted the IJ's decision, we have authority to review it too.[3]

We review an immigration court's factual findings for substantial evidence.[4]  "On substantial-evidence review, factual findings are not reversed unless the petitioner demonstrates 'that the evidence is so compelling that no reasonable factfinder could reach a contrary conclusion.'"[5]

## A

We first consider the adverse credibility determination rejecting Muminov's testimony that he was attacked on political grounds. "Credibility determinations are factual findings that are reviewed for substantial evidence."[6]  To meet that standard, credibility determinations "must be supported by specific and cogent reasons derived from the record."[7]  However, "the reasons provided need not 'go[] to the heart of the

---

[1] *Arulnanthy v. Garland*, 17 F.4th 586, 592 (5th Cir. 2021).

[2] *Wang v. Holder*, 569 F.3d 531, 536 (5th Cir. 2009).

[3] *See id.*

[4] *Avelar-Oliva v. Barr*, 954 F.3d 757, 763 (5th Cir. 2020).

[5] *Id.* (quoting *Orellana-Monson v. Holder*, 685 F.3d 511, 518 (5th Cir. 2012)).

[6] *Id.*

[7] *Singh v. Sessions*, 880 F.3d 220, 225 (5th Cir. 2018) (quoting *Wang*, 569 F.3d at 537).

6

applicant's claim.'"[8]   Rather, "an IJ may rely on *any* inconsistency or omission in making an adverse credibility determination as long as the 'totality of the circumstances' establishes that an asylum applicant is not credible."[9]   "This includes inconsistencies and omissions that arise when comparing an applicant's statements in a credible-fear interview to his testimony at an immigration hearing."[10]

Such inconsistencies and omissions regarding Muminov's political activities support the adverse credibility determination here.  In his credible-fear interview, Muminov did not describe his alleged 2016 protest of the confiscation of his passport or the beating that he incurred thereafter.  Nor did he describe the alleged 2018 incident in which an officer put a gun to his head.  When asked about the last time he was harmed by police, Muminov identified a date in 2017.  In addition, Muminov's account of the complaint he filed against the government and his subsequent abuse differed between the interview and the hearing.  In the interview, Muminov did not say that the complaint pertained to corruption, as he later did at the hearing.  Given these discrepancies, a reasonable factfinder could conclude, as the IJ and BIA did, that Muminov's testimony about politically motivated attacks "was too inconsistent . . . for the Court to form an accurate picture of the events that transpired in those instances."[11]

---

[8] *Arulnanthy v. Garland*, 17 F.4th 586, 593 (5th Cir. 2021) (alteration in original) (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)).

[9] *Wang*, 569 F.3d at 538 (quoting *Lin v. Mukasey*, 534 F.3d 162, 167 (2d Cir. 2008)); *see also id.* at 539 (adopting the Seventh Circuit's formulation of the standard).

[10] *Arulnanthy*, 17 F.4th at 593.

[11] *See id.*; *Avelar-Oliva*, 954 F.3d at 768.

Muminov does not contest the adequacy of the credible-fear interview in eliciting his account of the harm he sustained.[12]  Rather, he argues that his hearing testimony is consistent with his credible-fear interview, only more detailed.  Muminov mischaracterizes the variance between his hearing testimony and his interview.  This is not a case in which Muminov merely "failed to remember non-material, trivial details that [are] only incidentally related to [his] claim of persecution."[13]  He made no mention of a group protest that he claimed to have organized or a gun that police allegedly held to his head.  Even if these lapses had been minor, an inconsistency need not "go[] to the heart of the applicant's claim" to support an adverse credibility determination.[14]  Muminov's omission of significant incidents that are central to his claims of political persecution "likely 'justifies the BIA's refusal to overturn the IJ's' credibility ruling 'in and of itself.'"[15]

The absence of corroborating evidence bolsters the adverse credibility determination.  While "[t]he testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration," that is "only if the applicant satisfies the trier of fact that the applicant's testimony is credible."[16]  In this case, the IJ was not satisfied that Muminov's testimony about politically motivated attacks was credible.  Since applicants "can be required to provide reasonably obtainable corroborating evidence even when their testimony is credible," they can be required to do so when their

---

[12] *See Avelar-Oliva*, 954 F.3d at 764-65 (considering a claim that a credible-fear interview was unreliable).

[13] *Morales v. Sessions*, 860 F.3d 812, 817 (5th Cir. 2017) (first alteration in original) (quoting *Kin v. Holder*, 595 F.3d 1050, 1057 (9th Cir. 2010)).

[14] *See* 8 U.S.C. § 1158(b)(1)(B)(iii).

[15] *Arulnanthy*, 17 F.4th at 594 (quoting *Morales*, 860 F.3d at 817).

[16] 8 U.S.C. § 1158(b)(1)(B)(ii).

No. 20-60527

testimony is not.[17]  The lack of corroborating evidence further undermines Muminov's already deficient account.[18]

Because "specific and cogent reasons" support the adverse credibility determination, we will not disturb it.[19]

## B

We next consider the determination that Muminov firmly resettled in Russia.  Applicants are statutorily barred from asylum if they have "firmly resettled in another country prior to arriving in the United States."[20]  Under the applicable regulation, an applicant is generally considered to be firmly resettled "if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement."[21]    There are exceptions, however, if the applicant demonstrates:

> (a) That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in the country only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or

---

[17] *Yang v. Holder*, 664 F.3d 580, 587 (5th Cir. 2011).

[18] *See Avelar-Oliva v. Barr*, 954 F.3d 757, 764 (5th Cir. 2020) ("The failure to present such evidence can be fatal to an alien's application for relief.").

[19] *Singh v. Sessions*, 880 F.3d 220, 225 (5th Cir. 2018) (quoting *Wang v. Holder*, 569 F.3d 531, 537 (5th Cir. 2009)).

[20] 8 U.S.C. § 1158(b)(2)(A)(vi).

[21] 8 C.F.R. § 1208.15 (2020).  A nationwide injunction bars the enforcement of more recent regulations that would redefine "firm resettlement."  *See Pangea Legal Servs. v. DHS*, 512 F. Supp. 3d 966, 977 (N.D. Cal. 2021) (enjoining revised versions of 8 C.F.R. §§ 208.15 and 1208.15).

(b) That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the asylum officer or immigration judge shall consider the conditions under which other residents of the country live; the type of housing, whether permanent or temporary, made available to the refugee; the types and extent of employment available to the refugee; and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.[22]

We review "factual determinations about firm resettlement and its exceptions for substantial evidence."[23] This court has not yet opined on the appropriate legal standard for determining whether firm resettlement has occurred.[24]

In general, we "review[] the BIA's legal determinations de novo, 'including whether the Board applied an inappropriate standard.'"[25] However, "the BIA is entitled to *Chevron* deference when it interprets a statutory provision of the INA [Immigration and Nationality Act] and gives the statute 'concrete meaning through a process of case-by-case

---

[22] 8 C.F.R. § 1208.15 (2020).

[23] *Ramos Lara v. Lynch*, 833 F.3d 556, 559 (5th Cir. 2016).

[24] *See id.* (declining to determine the validity of the BIA's legal framework because it was not at issue).

[25] *Ghotra v. Whitaker*, 912 F.3d 284, 288 (5th Cir. 2019) (quoting *Iruegas-Valdez v. Yates*, 846 F.3d 806, 810 (5th Cir. 2017)).

No. 20-60527

adjudication,' so long as the BIA's opinion is precedential."[26]   Under *Chevron*, we "afford agency interpretations of statutes 'controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute' or Congress has 'unambiguously expressed' a contrary intent."[27] Likewise, the BIA is entitled to *Auer* deference "when it interprets its own ambiguous regulations."[28]   Under *Auer*, we accept the BIA's interpretation unless it is "plainly erroneous or inconsistent with the regulation" or "there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'"[29]

In this case, the IJ and BIA determined that Muminov had firmly resettled in Russia, applying the legal framework that the BIA set forth in a precedential opinion, *In re A-G-G*.[30]   *A-G-G* addressed the question of who bears the burden of proving firm resettlement, which the INA and firm resettlement regulations do not "explicitly allocate."[31]   The BIA interpreted the statute and regulations to call for a burden-shifting analysis.[32]   Neither

---

[26] *Calvillo Garcia v. Sessions*, 870 F.3d 341, 343-44 (5th Cir. 2017) (quoting *Ali v. Lynch*, 814 F.3d 306, 309-10 (5th Cir. 2016)) (footnote omitted); *see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842-44 (1984).

[27] *Calvillo Garcia*, 870 F.3d at 344 (quoting *Orellana-Monson v. Holder*, 685 F.3d 511, 517 (5th Cir. 2012)).

[28] *Gomez v. Lynch*, 831 F.3d 652, 655 (5th Cir. 2016); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997).

[29] *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (quoting *Auer*, 519 U.S. at 461-62).

[30] 25 I. & N. Dec. 486 (BIA 2011).

[31] *Id.* at 501; *see also* 8 C.F.R. § 1240.8(d) ("If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.").

[32] *A-G-G*, 25 I. & N. Dec. at 501-03.

No. 20-60527

party disputes that the *A-G-G* framework is entitled to deference. Every circuit court to have analyzed the framework has applied it to assess firm resettlement.[33]    Accordingly, we assume without deciding that *A-G-G* governs our analysis of firm resettlement in this case.

The *A-G-G* framework consists of four steps.[34]    At the first step, "DHS bears the burden of presenting prima facie evidence of an offer of firm resettlement."[35]  To make this prima facie showing:

> DHS should first secure and produce direct evidence of governmental documents indicating an alien's ability to stay in a country indefinitely. Such documents may include evidence of refugee status, a passport, a travel document, or other evidence indicative of permanent residence.
>
> If direct evidence of an offer of firm resettlement is unavailable, indirect evidence may be used to show that an offer of firm resettlement has been made if it has a sufficient level of clarity and force to establish that an alien is able to permanently reside in the country. Indirect evidence may include the following: the immigration laws or refugee process of the country of proposed resettlement; the length of the alien's stay in a third country; the alien's intent to settle in the country; family ties and business or property connections; the extent of social and economic ties developed by the alien in the country; the receipt of government benefits or assistance, such as assistance for rent, food, and transportation; and whether the alien had legal

---

[33] *See Matumona v. Barr*, 945 F.3d 1294, 1301 (10th Cir. 2019); *Hanna v. Holder*, 740 F.3d 379, 393-94 (6th Cir. 2014); *see also Naizghi v. Lynch*, 623 F. App'x 53, 58 (4th Cir. 2015) (per curiam) (unpublished) (holding that *A-G-G* is "a reasonable interpretation of the firm resettlement statute and regulation, and should be given deference"); *Haghighatpour v. Holder*, 446 F. App'x 27, 31 (9th Cir. 2011) (per curiam) (unpublished) (remanding to apply the *A-G-G* framework).

[34] *A-G-G*, 25 I. & N. Dec. at 501.

[35] *Id.*

No. 20-60527

rights normally given to people who have some official status,
such as the right to work and enter and exit the country.[36]

DHS need not proffer additional evidence to meet its burden. "Prima
facie evidence of an offer of firm resettlement may already be a part of the
record of proceedings as testimony or other documentary evidence."[37]

At the second step, "the alien can rebut the DHS's prima facie
evidence of an offer of firm resettlement by showing by a preponderance of
the evidence that such an offer has not, in fact, been made or that he or she
would not qualify for it."[38] Applicants cannot rebut DHS's evidence by
showing that they "refused to accept an offer of firm resettlement,"
however.[39] "The regulations only require that an offer of firm resettlement
was available, not that the alien accepted the offer."[40] An acceptance
requirement would run "contrary to the purpose of the firm resettlement bar,
which is to limit refugee protection to those with nowhere else to turn."[41] At
the third step, the IJ considers "the totality of the evidence presented by the
parties to determine whether an alien has rebutted the DHS's evidence of an
offer of firm resettlement."[42] At the fourth step, if the IJ determines that the
applicant firmly resettled, "the burden then shifts to the alien . . . to establish

---

[36] *Id.* at 501-02 (footnote omitted).

[37] *Id.* at 502 n.17; *accord Hanna*, 740 F.3d at 394; *Firmansjah v. Gonzales*, 424 F.3d 598, 602 (7th Cir. 2005).

[38] *A-G-G*, 25 I. & N. Dec. at 503.

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

No. 20-60527

that an exception to firm resettlement applies by a preponderance of the evidence."[43]

Applying this framework, the IJ and BIA ruled that DHS established a prima facie case of firm resettlement, which Muminov did not refute. Under our limited substantial-evidence review, we are not compelled to reach a contrary conclusion.[44]

At the first step, the IJ and BIA reasonably determined that Muminov's testimony supplied indirect evidence of firm resettlement. Muminov testified that he had lived in Russia for over eight years. For most of that time, Muminov said, he was joined by his wife and his two children, who were born in Russia. He reported that he started a business with his wife and obtained a work permit from the Russian government. "[T]he length of the alien's stay in a third country," "family ties," "business or property connections," and the possession of "legal rights normally given to people who have some official status, such as the right to work" may all go toward a prima facie showing.[45] A reasonable factfinder could conclude that the combination of indirect evidence on these points has the "sufficient level of clarity and force" for DHS to meet its burden.[46]

At the second and third steps, the IJ and BIA reasonably determined that Muminov had not adequately rebutted DHS's prima facie case. As they explained, Muminov's testimony that he could not obtain Russian

---

[43] *Id.*

[44] *See Avelar-Oliva v. Barr*, 954 F.3d 757, 763 (5th Cir. 2020).

[45] *A-G-G*, 25 I. & N. Dec. at 502; *cf. Naizghi v. Lynch*, 623 F. App'x 53, 58 (4th Cir. 2015) (per curiam) (unpublished) (holding that the government offered sufficient indirect evidence to make a prima facie showing of firm resettlement based in part on the duration of the applicant's stay, her temporary work permit, and her ability to obtain housing).

[46] *A-G-G*, 25 I. & N. Dec. at 502.

No. 20-60527

citizenship did not overcome the many indicia that he had established a home in Moscow.

Muminov argues that he rebutted DHS's evidence with his testimony that he could be deported from Russia to Uzbekistan at any moment, in light of the close relationship between Russian and Uzbek authorities. Yet Muminov lived and worked in Russia for over eight years without deportation. Nor does the record show any confrontation with Russian authorities suggesting that he faced a risk of deportation. As the IJ and BIA noted, Muminov was able to return to Russia after spending time in Uzbekistan.[47] Based on the "totality of the evidence presented," the IJ and BIA were within their broad discretion to conclude that Muminov's offer of firm resettlement was valid.[48]

As to the fourth step, Muminov contends that he qualifies for the restricted-residence exception to the firm resettlement bar. This exception is available to an applicant whose living conditions "were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled."[49] He cites his testimony about extortionate fees that he was forced to pay to live in Moscow and the harassment and discrimination that he faced there.

This testimony may well support a restricted-residence exception,[50] but we cannot say that the IJ and BIA were compelled to conclude that the

---

[47] *See id.* (holding that "the right to . . . enter and exit the country" is relevant evidence of firm resettlement).

[48] *Id.* at 503.

[49] 8 C.F.R. § 1208.15(b) (2020).

[50] *See In re D-X- & Y-Z-*, 25 I. & N. Dec. 664, 668 (BIA 2012) (suggesting that claims of "harassment, discrimination, or persecution" could support a restricted-residence exception); *Andriasian v. INS*, 180 F.3d 1033, 1043 (9th Cir. 1999) (rejecting firm

No. 20-60527

exception applies in this case.  In accordance with the regulation governing the exception, the IJ and BIA considered Muminov's access to housing, employment, and travel into and out of Russia, which his payments to the government did not necessarily undercut.[51]  The IJ and BIA also reasoned that Muminov was victimized by private individuals rather than the Russian government.[52]  In light of these considerations, the IJ and BIA had the discretion to conclude that restrictions by Russian authorities on Muminov's residence were neither substantial nor conscious enough to warrant the exception.[53]

\*        \*        \*

Because substantial evidence supports the adverse credibility and firm resettlement determinations, we DENY Muminov's petition for review.

---

resettlement when the applicant's stay in the purported country of refuge "was disrupted by harassment, discrimination, and threats to personal safety").

[51] *See* 8 C.F.R. § 1208.15(b) (2020).

[52] *See Naizghi v. Lynch*, 623 F. App'x 53, 55, 58 (4th Cir. 2015) (per curiam) (unpublished) (upholding firm resettlement despite an applicant's rape in the country of refuge by customers of her workplace).

[53] *See* 8 C.F.R. § 1208.15(b) (2020).